**In re GENERAL SEARCH.COM, Debtor.**

**David E. Grochocinski, Trustee, Plaintiff,**

v.

**Reliant Interactive Media Corp., a Nevada Corporation, Defendant.**

Bankruptcy No. 01 B 28659.
Adversary No. 03 A 03311.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 12, 2005.

---

Michelle G. Novick, Esq., Gary E. Green, Esq., & Christina M. Berish, Esq., Fagel & Haber, Chicago, IL, for Plaintiff.

Paul V. Possinger, Esq., Jennifer A. Hasch, Esq., & Jeremy T. Stillings, Esq., Jenner & Block, LLP, Chicago, IL, for Defendant.

## *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the second amended complaint filed by

David E. Grochocinski, the Chapter 7 trustee (the "Trustee") of the estate of General Search.com (the "Debtor") against Reliant Interactive Media Corporation ("Reliant") to avoid an alleged fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i) and (ii) and 11 U.S.C. § 550(a) and on the motion for directed findings made at trial by Reliant pursuant to Federal Rule of Bankruptcy Procedure 7052. For the reasons set forth herein, the Court denies the motion for directed findings. The Court grants judgment in favor of the Trustee and finds that the Debtor's $200,000.00 reduction of a balance due and owing it by Reliant constitutes a constructively fraudulent conveyance pursuant to § 548(a)(1)(B). Under § 550(a)(1) the Trustee may recover that sum from Reliant for the benefit of the Debtor's estate, plus prejudgment interest from the date of the filing of the adversary proceeding, August 6, 2003, pursuant to the rate set forth in 28 U.S.C. § 1961.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O).

## II. FACTS AND BACKGROUND

The parties have stipulated to many of the facts in this matter. Reliant is a Nevada corporation and a wholly owned subsidiary of Thane International, Inc. ("Thane"), a publicly traded Delaware corporation. *See* Stip. of Facts at ¶ 3. From 1999 through 2003, Reliant was in the business of marketing products through televised informational commercials, also commonly known as infomercials. *Id.* Kevin

Harrington was the chief executive officer of Reliant; Kevin Harrington's brother, Tim Harrington, was the president; and Mel Arthur was the executive vice president of Reliant.

From 1999 through the filing of the Chapter 7 case, Jeffery Bruss was the chief executive officer of the Debtor. *Id.* at ¶ 15. The Debtor advertised that it was a provider of full, free internet services, including free internet access, free electronic mail, free facsimile services, free voicemail, and free digital subscriber line (DSL) service to end-user consumers. *See* Reliant Ex. Nos. 25 & 26; Trustee Ex. Nos. 28 & 29. The Debtor generated at least two computer disks for the installation of its free internet services software on computers. *See* Stip. of Facts at ¶ 26. Imprinted on these disks were its advertising slogans "free internet access" and "free internet access for life." *Id.*

In August 1999, Reliant and Systemax, Inc. ("Systemax") commenced a business relationship. *Id.* at ¶ 24. Reliant sold computers that were manufactured and/or liquidated by and through Systemax. *Id.* From 1999 through 2001, Systemax provided Reliant with regular reconciliations of the number of computers sold, the expenses incurred with selling the computers, and the number of computers returned. *Id.* At all relevant times, William Lynch was the division president of Systemax in charge of computer sales, and was Reliant's primary contact at Systemax. *Id.* at ¶ 25. The Debtor did not have a business relationship with Systemax.

During late 2000 and early 2001, Reliant contracted with customer call centers to service customer complaints received from the sale of Systemax computers through Reliant's infomercials. *Id.* at ¶ 27. Systemax, and thus Reliant, allowed its customers to return a computer for no reason as long as the return was made within thirty

days of the sale. *Id.* at ¶ 28. If a computer was returned to Systemax, Systemax would try to refurbish the computer, disassemble the parts for sale, or return it to its vendor for a full or partial credit. *Id.* at ¶ 29.

In April 2000, Teleservices Internet Group ("TSIG"), a public corporation, acquired the Debtor. *Id.* at ¶ 16. At this time, the Debtor became a wholly owned subsidiary of TSIG. *Id.* In August 2000, TSIG entered into discussions with Reliant with respect to a potential merger transaction among TSIG, Reliant, the Debtor, and The Affinity Group, LLC. *Id.* at ¶ 17. In anticipation of the merger, Reliant requested a loan from the Debtor so that Reliant could fill purchase orders Reliant received from the QVC home shopping channel. *Id.* at ¶ 18.

On September 13, 2000, the Debtor extended the requested credit to Reliant and received a note from Reliant in the amount of $679,092.00. *Id.* at ¶ 19; Reliant Ex. No. 20. In further anticipation of the acquisition of Reliant, on October 5, 2000, the Debtor made another loan and received a second note from Reliant in the sum of $275,000.00 (collectively the "Notes"). *See* Stip. of Facts at ¶ 19; Reliant Ex. No. 22.

The proceeds of the loans evidenced by the Notes were used by Reliant to purchase inventory to fill the purchase orders received by Reliant from the QVC home shopping channel. *See* Stip. of Facts at ¶ 19. On November 30, 2000, Reliant announced that it decided not to enter into the proposed merger. *Id.* at ¶ 20.

As of April 1, 2001, Reliant had paid the sum of $392,304.08 on its Notes to the Debtor, leaving an unpaid balance of $561,787.92. *See* Trustee Ex. No. 8; Reliant Ex. No. 19. On April 5, 2001, the Debtor and Reliant entered into a settlement agreement whereby Reliant agreed to pay the Debtor the balance due under the Notes, less a reduction of $200,000.00 (the "Settlement Agreement").[1] *See* Stip. of Facts at ¶ 21; Trustee Ex. No. 8; Reliant Ex. No. 19. It is this reduction under the Settlement Agreement that is the focus of this matter. Pursuant to the Settlement Agreement, Reliant made the following payments on the Notes: (1) $392,304.08 to TSIG, the Debtor's parent corporation; (2) $50,000.00 to the Debtor on April 17, 2001; (3) $50,000.00 to the Debtor on April 25, 2001; (4) $65,446.98 to the Debtor on May 11, 2001; (5) $65,446.98 to the Debtor on June 6, 2001; (6)

---

1. The text of the signed Settlement Agreement provides in substantial part as follows:

This Settlement Agreement of April 5, 2001 is hereby executed between [the Debtor], a Minnesota corporation, with offices located at PO Box 909, Batavia, Illinois 60510 and [Reliant], a Nevada corporation, located at 2701 Rocky Point Drive, Suite 200, Tampa, Florida 33607. It is hereby agreed that:

A) [The Debtor] has given a loan to [Reliant] of $954,092.

B) [The Debtor] agrees that [Reliant] has given [TSIG] $392,304.08 to be applied toward said loan leaving a balance of $561,787.92.

C) [The Debtor] has agreed to deduct $200,000 from the balance leaving an amount due [the Debtor] by [Reliant] of $361,787.92.

D) [Reliant] agrees to provide a payment to [the Debtor] of $100,000 within 7 days of the execution of this Settlement Agreement.

E) The balance of $261,787.92 shall be paid in 4 equal monthly payments commencing 30 days following [Reliant] issuing the $100,000 payment and continuing each 30 days thereafter for a payment of $65,446.98 each 30 days.

F) Upon [Reliant] making the final payment to [the Debtor] this loan shall be deemed Paid in Full and no further compensation shall [be] due [the Debtor].

G) All monies must be made by check or wire and made directly to [the Debtor] and no other parties.

Trustee Ex. No. 8; Reliant Ex. No. 19.

$65,446.98 to the Debtor on July 3, 2001; and (7) $65,446.98 to the Debtor on July 31, 2001. *See* Stip. of Facts at ¶ 22; Trustee Ex. No. 9; Reliant Ex. No. 13.

On August 15, 2001, the Debtor filed a voluntary Chapter 7 petition. On August 6, 2003, the Trustee filed this adversary proceeding initially against Thane, wherein the Trustee sought to avoid and recover as an alleged fraudulent transfer the $200,000.00 reduction in the balance due under the Notes. On November 14, 2003, pursuant to Thane's motion, the Court dismissed the complaint, and granted the Trustee leave to file an amended complaint.[2] Thereafter, on November 24, 2003, the Trustee filed an amended complaint against Reliant wherein he alleged that the reduction of $200,000.00 in the debt owed to the Debtor by Reliant pursuant to the Notes constituted a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i) and (ii) and recoverable under 11 U.S.C. § 550(a). On August 6, 2004, the Trustee filed the second amended complaint, which contains the same substantive allegation as the amended complaint. *See* Trustee Ex. No. 1. Reliant filed its answer to the second amended complaint on August 17, 2004 wherein it denied that the transfer was fraudulent. *See* Trustee Ex. No. 2. Reliant did not assert any affirmative defenses.

The Court held an evidentiary hearing in this matter. Reliant made a motion for directed findings under Federal Rule of Bankruptcy Procedure 7052, which incorporates by reference Federal Rule of Civil Procedure 52(c). The Court reserved ruling on the motion until the close of all of the evidence.

## III. DISCUSSION

The Trustee argues that the Debtor's reduction of the balance owed it by Reliant under the Notes was a constructively fraudulent conveyance pursuant to § 548(a)(1)(B). "Fraudulent conveyance law protects creditors from last-minute diminutions of the pool of assets in which they have interests." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir.1988). Section 548(a)(1)(B) of the Bankruptcy Code provides that:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

2. During closing arguments, the Trustee requested a judgment against both Reliant and Thane. The Court finds this request disingenuous given the fact that the original complaint, which named Thane as a defendant, was dismissed. The Court will not enter a judgment against a party who has not been named as a defendant in the complaint at bar and who was previously dismissed. This matter was tried only against Reliant and, thus, judgment will be entered against that party-defendant, not Thane. If the Trustee seeks to enforce the judgment against Thane in proceedings supplementary to and in aid of a judgment, he must proceed pursuant to Federal Rule of Bankruptcy Procedure 7069, which incorporates by reference Federal Rule of Civil Procedure 69.

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B) (2005).

■ The cause of action under § 548(a)(1)(B) is often referred to as "constructive fraud" because it omits any element of intent. *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996). In order for a trustee to establish a fraudulent conveyance under § 548(a)(1)(B), he must prove the following elements: (1) a transfer of the debtor's property or interest therein; (2) made within one year of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) either (a) the debtor was insolvent when the transfer was made or was rendered insolvent thereby; or (b) the debtor was engaged or about to become engaged in a business or a transaction for which its remaining property represented an unreasonably small capital; or (c) the debtor intended to incur debts beyond its ability to repay them as they matured. *Dunham v. Kisak,* 192 F.3d 1104, 1109 (7th Cir.1999); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 505 (N.D.Ill.1988); *Barber v. Dunbar (In re Dunbar),* 313 B.R. 430, 434 (Bankr. C.D.Ill.2004). The trustee must prove each element by a preponderance of the evidence. *Frierdich v. Mottaz,* 294 F.3d 864, 867 (7th Cir.2002); *Baldi v. Lynch (In re McCook Metals, L.L.C.),* 319 B.R. 570, 587 (Bankr.N.D.Ill.2005).

■ When a transfer is avoided under § 548(a), the next step is to look to 11 U.S.C. § 550(a), which provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property...." 11 U.S.C. § 550(a)(1) (2005); *see also FBN Food Servs.,* 82 F.3d at 1396.

"Once the whole transfer has been pulled into the estate, the money is distributed according to the priorities established by the Code and the debtor's own commitments." *FBN Food Servs.,* 82 F.3d at 1396. Although the general rule is that transferees must either return the property or pay its value, there are exceptions under § 548(c) and § 550(b). *In re Cohen,* 199 B.R. 709, 719 (9th Cir. BAP 1996). Where, as here, recovery is sought from the initial transferee of property, only the defense under § 548(c) is potentially available. *See Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 419–20 (Bankr.D.Ariz.1994) (noting that the defense under § 550(b) is unavailable to "initial transferee"); *Bucki v. Singleton (In re Cardon Realty Corp.),* 146 B.R. 72, 79 n. 11 (Bankr.W.D.N.Y.1992) (same). Reliant has not asserted any defenses to the recovery of this alleged fraudulent conveyance.

The Court will address each element the Trustee must establish under § 548(a)(1)(B) in turn.

## A. Whether there was a transfer

■ The initial issue the Court must determine is whether the Debtor's reduction of the $200,000.00 balance due on the Notes was a "transfer" of an interest of the Debtor in property for purposes of § 548(a)(1)(B). The Trustee failed to address this element in either the pretrial papers or at the trial, even though he has the burden of proof on this issue. Nevertheless, the Court will address this element. The Bankruptcy Code defines "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54) (2005). The legislative history indicates that this definition is meant to be broad. S.REP. No.

95–989, at 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813. "The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction." *Dunbar*, 313 B.R. at 435. While the Bankruptcy Code does not define "an interest of the debtor in property," the Seventh Circuit has held that "property belongs to the debtor ... if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors." *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1352 (7th Cir.1996) (internal quotation omitted).

The Court finds that the reduction of the $200,000.00 balance due under the Notes constitutes a transfer of an interest of the Debtor in property under the definitions set forth above. By entering into the Settlement Agreement with Reliant, the Debtor parted with $200,000.00 that it was otherwise entitled to receive under the terms of the Notes given it by Reliant. The Debtor could have used this money to satisfy the claims of its creditors. Thus, the Court finds that the Debtor's forgiveness of a portion of the debt owed it by Reliant constitutes a "transfer" for purposes of § 548(a)(1).

### B. Whether the transfer occurred within one year of the filing of the case

Next, the Court finds and the parties stipulated that the $200,000.00 reduction of the balance due on the Notes occurred within one year of the filing of the Chapter 7 case. *See* Stip. of Facts at ¶ 23. The Settlement Agreement, which embodied the reduction of the debt owed by Reliant to the Debtor, was entered into on April 5, 2001, and the Debtor filed the Chapter 7 case on August 15, 2001. Hence, this element has been met.

### C. Whether there was reasonably equivalent value given in exchange for the transfer

Next, the Court must determine whether the Debtor received less than a reasonably equivalent value in exchange for the transfer. The parties have focused much of their attention on this element. Reliant argues that it was its intention to treat the $200,000.00 reduction of its indebtedness to the Debtor under the Settlement Agreement as the recovery of a portion of any actual or potential future losses caused by the Debtor through its right of setoff, and that the Debtor would have a credit in that amount against any judgment ultimately entered or claim allowed in favor of Reliant against the Debtor. According to Reliant, the reduction of its indebtedness to the Debtor under the Settlement Agreement was sufficiently satisfactory to Reliant that it did not commence legal action against the Debtor. Reliant contends that had the parties not entered into the Settlement Agreement, it would have sued the Debtor for damages caused by the Debtor's failure to provide free internet service as promised to Reliant. Moreover, Reliant contends that the Settlement Agreement constituted a settlement of $561,787.92 of the outstanding notes for the sum of $361,787.92 free and clear of Reliant's rights of setoff. Reliant claims that by agreeing to the payment schedule in the Settlement Agreement, it saved the Debtor from incurring costs to pursue its remedies related to repayment of an amount that was both uncertain and subject to defenses. Thus, according to Reliant, the reduced payment schedule in the Settlement Agreement provided value to the Debtor.

The Trustee, on the other hand, argues that the Settlement Agreement did not act as a release of any claims or causes of action that Reliant had or may have had

against the Debtor. According to the Trustee, the Debtor, through Jeffery Bruss, accepted the reduced loan balance from Reliant because it was in dire financial need of cash. Thus, the Trustee contends that there was no consideration that the Debtor received of a value reasonably equivalent to the $200,000.00 reduction of the remaining balance due under the Notes.

The Bankruptcy Code does not define the term "reasonably equivalent value." The Seventh Circuit, however, has stated that the test utilized to determine "reasonably equivalent value" requires the court to determine the value of what was transferred and compare that value to the value the debtor received. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir.1997). The determination of "reasonably equivalent value" is not a fixed mathematical formula. *Id.* Section 548(d)(2)(A) of the Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A) (2005).

■■■■ Indeed, determination of "reasonably equivalent value" under § 548(a)(1)(B) is a two-step process. *Anand v. Nat'l Republic Bank of Chi.*, 239 B.R. 511, 516–17 (N.D.Ill.1999).[3] The court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up. *Id.* at 517. The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult. *Id.* "Equivalent value must be measured as of the time of the transfer." *McCook*, 319 B.R. at 589.

■■■■ Whether "reasonably equivalent value" has been given is a question of fact that depends on the circumstances surrounding the transaction. *Barber*, 129 F.3d at 387. The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*; *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr.N.D.Ill.1999). The Trustee bears the burden of proof on this issue. *See Barber*, 129 F.3d at 387.

The Court must determine whether the Debtor received consideration from Reliant under the terms of the Settlement Agreement that had a value that was reasonably equivalent to the $200,000.00 reduction of the indebtedness. It is undisputed that the Settlement Agreement did not contain any language that set forth the release of any potential claims or causes of action Reliant may have had against the Debtor, nor does it recite any consideration paid to or for the benefit of the Debtor in exchange for the reduction of the $200,000.00 owed by Reliant to the Debtor. Jeffery Bruss, the chief executive officer of the Debtor, testified that he reluctantly agreed to the $200,000.00 reduction of the amount Reliant owed pursuant to the Notes because the Debtor's financial condition was weak. Bruss stated that the Debtor had no liquid cash and owed numerous creditors, including the Internal Revenue Service and several of the Debtor's employees. Further, Bruss testified that he did not deem the Settlement

---

3. The *Anand* case references § 548(a)(2). Section 548(a)(1)(B)(i)-(ii) was formerly designated as § 548(a)(2)(A)-(B) before amendment by the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, effective for cases pending or commenced on or after June 19, 1998.

Agreement fair, and, in his opinion, the Debtor received no consideration for the reduction of the debt. According to Bruss, Tim Harrington from Reliant told him to "take it or leave it." Bruss testified that he took the deal because the Debtor desperately needed the funds. Additionally, Bruss stated that the Debtor did not have the funds to hire an attorney to collect the amount owed pursuant to the Notes. Finally, he testified that he was not aware of any defenses that Reliant had to the payment of the full balance due under the Notes.

Kevin Harrington, the chief executive officer of Reliant, testified that Reliant experienced numerous problems with the Debtor's software and received thousands of phone calls from its customers complaining of the Debtor's defective software. According to Harrington, the Debtor's faulty software adversely affected its business relationship with Systemax. Harrington testified that Systemax terminated the relationship with Reliant and, as a result, Reliant lost millions of dollars in revenues. However, according to William Lynch, the former president of Systemax, Systemax did not terminate its relationship with Reliant solely because of the Debtor's alleged software problems. *See* Reliant Ex. No. 43 at pp. 84–89. Rather, Lynch testified that over time, Systemax gradually changed its business model where it strictly became a producer of infomercials. *Id.* at pp. 87–89. In fact, Lynch testified that in October 2002, Reliant was still doing business with Systemax. *Id.* at p. 88.

In connection with the Settlement Agreement, Harrington stated that he informed Bruss of Reliant's revenue losses because of the Debtor's defective software, and offered the $200,000.00 reduction of the balance due under the Notes as a fair and reasonable settlement. Harrington denied that he made the settlement as a "take it or leave it" offer. Finally, Harrington testified that he believed that Reliant had a larger setoff claim against the Debtor than the balance due under the Notes.

Mel Arthur, Reliant's vice president, also testified that in his opinion, Reliant's damages, as a result of the Debtor's allegedly defective software, far exceeded the amount due the Debtor under the Notes, and in fact, those damages were in the millions of dollars. Arthur admitted that Reliant did not possess any documentation to corroborate his estimate of the claimed damages it suffered. Arthur testified that Reliant lost all of its computer records and data because of a system "virus." Both Harrington and Arthur admitted that the Settlement Agreement did not contain any language that released the Debtor from liability for any potential claims or causes of action Reliant had against the Debtor.

The Court finds that the Debtor did not receive consideration from Reliant under the terms of the Settlement Agreement that had a value that was reasonably equivalent to the $200,000.00 reduction of the indebtedness due and owing under the Notes. According to Harrington and Arthur, Reliant suffered damages as a result of the Debtor's defective software that far exceeded the total amount due under the Notes. However, there was no evidence adduced by Reliant that demonstrated the value of those claims or causes of action. Moreover, the Settlement Agreement itself did not contain any language that would have released any of those potential claims, setoffs or causes of action that Reliant possessed against the Debtor. Indeed, Reliant never filed suit against the Debtor for its allegedly defective software and for Reliant's alleged multi-million dollar damages suffered as a result of the Debtor's faulty product. Moreover, Reli-

ant did not file a claim in the Debtor's bankruptcy case. If Reliant had suffered damages of such a significant amount, the Court finds it difficult to conceive of a reason why Reliant would not have pursued some legal action against the Debtor or filed a claim in the bankruptcy case. Instead, Reliant allegedly settled for a $200,000.00 reduction of the amount due under the Notes.

Additionally, Reliant failed to produce any evidence to demonstrate or corroborate that it suffered, at a minimum, damages in the amount of $200,000.00. Reliant's claimed damages are not the functional equivalent of adequate consideration for the $200,000.00 reduction of the debt. Accordingly, the Court is unable to find, based on the evidence submitted, that the value that went out from the Debtor, a $200,000.00 reduction of debt, was comparable or reasonably equivalent to what came in to the Debtor from Reliant under the Settlement Agreement.

Furthermore, the Court rejects the argument that the Debtor realized value from the Settlement Agreement because the reduction in the outstanding amount under the Notes effectuated a partial setoff of claims and causes of action that Reliant could have asserted in good faith against the Debtor.[4] The Court cannot make the determination, based on the limited record, that the value of Reliant's alleged claims, causes of action, and setoff

rights equaled or exceeded the $200,000.00 reduction of debt pursuant to the Settlement Agreement. The documentary evidence does not support a finding that Reliant forbore from asserting multiple claims against the Debtor due to the entry of the Settlement Agreement, thus conveying value to the Debtor that was reasonably equivalent to or greater than the amount of the transfer to Reliant.

Reliant contends that although the nature of the Settlement Agreement renders the dollar value the Debtor received from Reliant uncertain, the totality of the record before the Court establishes that the Debtor received actual value from Reliant under the Settlement Agreement. Reliant argues that the $200,000.00 reduction in the amount owed under the Notes creates a ceiling on the value of the property transferred. Reliant maintains that the Court can approximate the actual value of the property transferred to Reliant by reference to the market value of the Notes or by adjusting the value of the Notes based on the following factors: (1) the collection risk; (2) the time value of money; (3) the lack of sufficient collateral; and (4) defenses to payment. Unfortunately for Reliant, this argument must fail. The Court is unable to adjust the value of the Notes based on the above factors because no evidence was introduced at trial to assist the Court in making that determination.

The Court finds that the evidence does not support Reliant's assertion that the

4. Reliant lists numerous claims that it alleged had against the Debtor, including: (1) the Debtor's breach of its agreement to provide free internet services to customers of Reliant; (2) the Debtor's breach of its warranty to provide free internet services for life; (3) the Debtor's potentially fraudulent misrepresentation to Reliant regarding its ability to provide free internet services for at least the life of the computers sold by Reliant, on which Reliant reasonably relied in producing and airing infomercials offering the Debtor's services; (4)

the value of marketing services provided to the Debtor by Reliant through the production and airing of the infomercials describing and offering the Debtor's services to the public; and (5) the Debtor's potentially fraudulent failure to disclose the material fact that Bruss had been indicted, as well as the ongoing proceedings involving him and the Securities Exchange Commission. See Reliant Proposed Findings of Fact and Conclusions of Law at p. 19.

Settlement Agreement effectuated a true compromise of the alleged disputes between the parties. The language in the Settlement Agreement does not support this contention. The single-page, terse Settlement Agreement recites that the Debtor made a loan to Reliant in the sum of $954,092.00 and that the Debtor agreed to deduct $200,000.00 from the balance, leaving an amount due the Debtor by Reliant of $361,787.92. Trustee Ex. No. 8; Reliant Ex. No. 19. Further, the Settlement Agreement sets forth the payment terms for the balance due under the loan and states that "[u]pon [Reliant] making the final payment to [the Debtor] this loan shall be deemed Paid in Full and no further compensation shall [be] due [the Debtor]." *Id.* The Settlement Agreement makes no reference to any consideration for the reduction of the loan balance, nor does it release the Debtor from any potential claims or causes of action that Reliant may have had against the Debtor. The Court rejects Reliant's contention that the Settlement Agreement provided the Debtor with adequate value because it saved the Debtor from incurring costs pursuing its remedies related to repayment of an amount that was uncertain and subject to potential defenses.

As additional support for the proposition that the Debtor received a reasonably equivalent value in exchange for the entry of the Settlement Agreement, Reliant cites *Schaps v. Just Enough Corp. (In re Pinto Trucking Serv., Inc.)*, 93 B.R. 379 (Bankr. E.D.Pa.1988). In *Pinto Trucking*, the court was faced with the issue of whether the debtor's transfer of stock to a party involved in pre-petition litigation with the debtor in settlement of that litigation constituted a fraudulent conveyance. The court found that the settlement, which was effectuated by the transfer of the debtor's stock, ultimately proven worthless, was made during arm's length negotiations, and was approved by all parties involved, including a neutral party, a court-appointed "conservator" of the debtor, as well as the court presiding over the litigation. *Id.* at 390. The *Pinto Trucking* court concluded that the trustee failed to establish that the debtor did not receive adequate consideration in the settlement of the litigation. *Id.* Specifically, the court opined that "[t]here is no question that the compromise of a dispute can supply the element of consideration in a contract." *Id.* at 389. Further, the court stated that:

> While it is true that a totally groundless claim or a non-dispute may not constitute consideration, ... the courts will not look at the underlying merits of a compromise very critically to determine its worth. "The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question."

*Id.* (*quoting Shipley v. Pittsburgh & L.E.R. Co.*, 83 F.Supp. 722, 762 (W.D.Pa. 1949)).

While the Court does not disagree with the general proposition that the compromise of a dispute can supply the element of consideration in a contract, the Seventh Circuit has opined that "reasonably equivalent value is something more than consideration to support a contract...." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 580 (7th Cir.1998); *see also In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202 (7th Cir.1988). This Court is bound by these decisions, not one from the bankruptcy court in Pennsylvania.

Nevertheless, the Court finds the *Pinto Trucking* case distinguishable from the situation at bar. In *Pinto Trucking*, there was pending litigation between the debtor and the recipient of the allegedly fraudu-

lent transfer. The *Pinto Trucking* court, however, was unwilling to place a dollar value on that litigation. Instead, that court determined that the compromise of the litigation had a value that must have been reasonably equivalent to the transfer because the compromise was entered into during arm's length negotiations and was approved by several neutral parties, including the court presiding over the litigation. 93 B.R. at 390.

These key factors—pending litigation, a compromise entered into during arm's length negotiations, and approval of the compromise by a neutral party, including the court—which were vital to the decision in *Pinto Trucking,* are absent in this matter. Reliant has only alleged potential causes of action, claims, and setoff rights against the Debtor, without having filed a lawsuit asserting those claims. There was no pending litigation between the Debtor and Reliant. Indeed, Bruss has denied that Reliant possessed any viable causes of action or setoffs against the Debtor. Further, Reliant failed to proffer any documentary evidence to corroborate the testimony of Kevin Harrington and Mel Arthur that Reliant's damages against the Debtor total in the millions of dollars. In addition, the Settlement Agreement here was not approved by any neutral parties, let alone a court. Bruss testified that he agreed to the Settlement Agreement, without the benefit of counsel, because the Debtor desperately needed whatever cash it could obtain from Reliant. Thus, the Court cannot necessarily make the determination, like the one made by the *Pinto Trucking* court, that this Settlement Agreement was entered into during arm's length negotiations between Reliant and the Debtor. Hence, the matter at bar is distinguishable from the *Pinto Trucking* case.

In sum, for the foregoing reasons, the Court finds that the Trustee has estab-lished that the Debtor did not receive consideration from Reliant under the terms of the Settlement Agreement that had a value that was reasonably equivalent to the $200,000.00 reduction of the indebtedness owed by Reliant to the Debtor.

### D. Whether the Debtor was insolvent

Finally, the Court must determine whether the Debtor was insolvent within the meaning of the Bankruptcy Code. The Code employs a balance sheet approach to the question of insolvency. *Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs, Ltd.),* 147 B.R. 140, 154 (Bankr.N.D.Ill.1992). Specifically, section 101(32) of the Code defines "insolvent" and states in relevant part that:

"insolvent" means—

(A) with reference to an entity ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A) (2005). The Seventh Circuit has interpreted this definition to require courts to determine what a willing buyer would pay for the debtor's entire package of assets and liabilities. *Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992). If the price is positive, the debtor is solvent; if the price is negative, the debtor is insolvent. *Id.* A trustee may utilize appropriate means to prove insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence. *Freeland v. Enodis Corp. (In re*

*Consolidated Indus. Corp.)*, 292 B.R. 354, 360 (N.D.Ind.2002).

Alan S. Horewitch ("Horewitch"), an accountant hired by the Trustee, testified regarding the Debtor's solvency. Horewitch testified that he has been a certified public accountant since 1972. He further stated that he has been involved in preparing financial statements for numerous clients, including Chapter 7 debtors. Horewitch prepared a "balance sheet-fair market value" on a compilation basis [5] for the Debtor as of February 28, 2001. Trustee Ex. No. 14. Horewitch admitted that this document was not an audited financial statement, but, rather, was a compilation, which was prepared after review of the Debtor's books and records and discussion with Bruss and others. In order to prepare his financial report, Horewitch testified that he reviewed the Debtor's receivables, a balance sheet prepared by the Debtor that showed the Debtor's assets and liabilities as of February 28, 2001, and an accounts payable aging summary as of March 26, 2001. Trustee Ex. Nos. 13 & 14; Reliant Ex. No. 31.

According to the Debtor's balance sheet, as of February 28, 2001, the Debtor had total assets of approximately $4,000,000.00 and total liabilities of approximately $684,000.00. Trustee Ex. No. 13; Reliant Ex. No. 31. Horewitch testified that he disagreed with the Debtor's balance sheet totals. Pursuant to his analysis of the Debtor's solvency, Horewitch stated that he did not include a promissory note receivable in the approximate amount of $2,200,000.00 in his calculation of the Debtor's assets because Bruss told him that TSIG, the company who owed the Debtor under the note, was out of business, and thus, the ability to collect on the note was uncertain. Horewitch admitted that he did no further investigation to ascertain whether TSIG was in fact insolvent and whether the promissory note was actually uncollectible. Further, Horewitch testified that in the preparation of his financial compilation for the Debtor, he valued the Debtor's property and equipment at $40,000.00 because many of the items had been expended. Thus, pursuant to the retrospective document Horewitch prepared, he testified that the Debtor was balance sheet insolvent as of February 28, 2001, and the Debtor's financial condition was the same at the time of the transfer on April 5, 2001.

The Trustee, who has been a Chapter 7 panel trustee since 1985, also testified that the Debtor was insolvent at the time of the transfer. The Trustee based this conclusion on his review of the Debtor's bankruptcy schedules and statement of finan-

---

5. Generally, there are three types of financial statements prepared by a certified public accountant: a compilation; a review; and an audited financial statement. A compilation involves putting financial data obtained from the company into financial statement form. *In a compilation, the accountant does not probe beneath the surface of the information provided, unless he becomes aware that the data given to him is in error or incomplete.* A review, on the other hand, gives the limited assurance that the accountant is not aware of any material modifications that should be made to the financial statements in order for them to be in conformity with generally accepted accounting principles (GAAP). A re-

view provides a limited degree of assurance about the financial statements, whereas a compilation provides no such assurance about the underlying financial data. An audited financial statement, however, provides reasonable assurance that an entity's financial statements present fairly, in all material respects, its financial position, results of operations, and cash flows, in conformity with GAAP. An audit enhances a user's confidence that financial statements do not contain material misstatements because the auditor is an independent and objective professional who is knowledgeable regarding the entity's business and financial reporting requirements.

cial affairs, conversations with Bruss, and the existence of an outstanding judgment against the Debtor at the time of the transfer.[6] Accordingly, based on these factors, the Trustee concluded that the Debtor was insolvent at the time of the transfer.

The Court notes that Reliant failed to proffer any evidence to rebut the conclusion of Horewitch and the Trustee that the Debtor was insolvent at the time of the transfer. Rather, Reliant attempted to discredit Horewitch's opinion by pointing to his failure to further investigate whether TSIG was insolvent and whether its note was actually uncollectible. The Court finds the testimony of both Horewitch and the Trustee credible, unrebutted, and supported by the evidence. Indeed, both witnesses have extensive experience evaluating debtors' solvency. The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946 (7th Cir.1988) (*citing Anderson*).

The Court must determine the weight to be attached to the testimony and the inferences to be drawn from the evidence admitted. The Court gives more weight to the balance sheet prepared by Horewitch, an experienced certified public accountant (Trustee Ex. No. 14) than the balance sheet prepared approximately six months prior to the filing of the bankruptcy case by an unknown accountant for the Debtor (Trustee Ex. No. 13). There was no evidence adduced by Reliant to show who prepared the Debtor's balance sheet nor the methodology utilized in arriving at the final figures to show the Debtor's solvency. Moreover, the Court rejects Reliant's argument that Horewitch's conclusion that the Debtor was insolvent at the time of the transfer is flawed because he gave no value to the TSIG note. Reliant offered no evidence to rebut Horewitch's testimony regarding the zero value he ascribed to the TSIG note. Rather, Reliant merely argues that the note should have been given some value because TSIG remained in business until 2002. Unfortunately for Reliant, arguments of counsel are afforded no weight and do not rise to the level of evidence. The Court may not arbitrarily reject uncontroverted evidence. *See Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr.N.D.Ill.2002). Reliant failed to proffer any evidence to support its argument that the TSIG note had value.

In sum, the Court finds that the Trustee has met all of the elements to establish that the transfer was constructively fraudulent under § 548(a)(1)(B). Thus, the Court enters judgment in favor of the Trustee and against Reliant.[7] Un-

---

6. A lawsuit was commenced in February 2001 by St. Paul Properties against the Debtor for forcible entry and detainer due to unpaid rent under a lease between the Debtor and St. Paul Properties. On May 7, 2001, the Circuit Court of DuPage County, Illinois entered a judgment in favor of St. Paul Properties and against the Debtor in the sum of $227,859.37, plus interest and costs. Shortly thereafter, and within ninety days of the filing of the Debtor's bankruptcy petition, St. Paul Properties commenced post-judgment collection proceedings against the Debtor. Trustee Ex. No. 17; Reliant Ex. No. 29.

7. During closing arguments, the Trustee requested an accounting of Reliant's assets. This relief was not sought by the Trustee in his second amended complaint. An accounting is appropriate only if a legal remedy

der § 550(a)(1), the Trustee may recover the $200,000.00 transfer from Reliant for the benefit of the Debtor's estate.

### E. Whether the Court should award prejudgment interest

The Trustee made a demand for prejudgment interest. The Bankruptcy Code does not specifically provided for the award of prejudgment interest. The purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. *See In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir.1997). Not only must the award of prejudgment interest be compensatory, it is also within a court's discretion to determine if such award is equitable. *Id.* ("Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."). "Discretion is not, however, authorization to decide who deserves the money more." *Id.* In other words, prejudgment interest "is simply an ingredient of full compensation," and should not be considered a windfall. *In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir.), *cert. denied*, 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998).

Prejudgment interest has been awarded pursuant to the rate set forth in 28 U.S.C. § 1961 from the date the adversary proceeding was filed. *See Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 219 B.R. 918, 921 (Bankr.D.Mass.1998), *aff'd*, 231 B.R. 829 (1st Cir. BAP 1999); *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr.S.D.Tex.1997); *Car-*

*mel v. River Bank Am. (In re FBN Food Servs., Inc.)*, 175 B.R. 671, 691 (Bankr. N.D.Ill.1994), *aff'd*, 185 B.R. 265 (N.D.Ill. 1995), *aff'd in part, remanded in part on other grounds*, 82 F.3d 1387 (7th Cir.1996); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 127 B.R. 903, 913 (Bankr.S.D.Fla.1991); *Nelson Co. v. Amquip Corp. (In re Nelson Co.)*, 117 B.R. 813, 818 (Bankr.E.D.Pa.1990) (noting that the award of interest prior to the date of demand would not be appropriate "because the transfer is not improper in any respect at the time it occurs"), *aff'd*, 128 B.R. 930 (E.D.Pa.1991), *aff'd*, 959 F.2d 1260 (3d Cir. 1992).

The Court exercises it discretion and awards the Trustee prejudgment interest in order to compensate the bankruptcy estate. The Trustee is entitled to prejudgment interest from the date the adversary proceeding was commenced, August 6, 2003, pursuant to the rate set forth in 28 U.S.C. § 1961.

## IV. CONCLUSION

For the foregoing reasons, the Court denies the motion of Reliant for directed findings. The Court enters judgment in favor of the Trustee and finds that the Debtor's $200,000.00 reduction of a balance due and owing it by Reliant constitutes a fraudulent conveyance under § 548(a)(1)(B). The Trustee may recover that sum from Reliant for the benefit of the Debtor's estate under § 550(a)(1), plus prejudgment interest pursuant to the rate set forth in 28 U.S.C. § 1961 from the date

would be inadequate. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir.2003). Furthermore, the following elements must be established: (1) breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts that are of a

complex nature. *Id.* The Trustee failed to plead or establish any of these requisite elements. Moreover, the judgment entered here in favor of the Trustee constitutes an adequate legal remedy. Accordingly, the Court denies the Trustee's request for an accounting.

of the filing of the adversary proceeding, August 6, 2003.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.