# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-2621
_____

Francisco Rodriguez-Quiroz

*Petitioner*

v.

Loretta E. Lynch, Attorney General of the United States

*Respondent*
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Submitted: May 17, 2016
Filed: August 31, 2016
_____

Before WOLLMAN, LOKEN, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Francisco Rodriguez-Quiroz, a native and citizen of Mexico, was charged with being subject to removal as an alien present in the United States without inspection and without admission or parole. Following a total of twelve hearings spread over a period of some fifty-five months, an immigration judge (IJ) sustained the charge, denied Rodriguez's request for adjustment of status, and granted his request for voluntary departure. The Board of Immigration Appeals (BIA) upheld the IJ's order

and dismissed the appeal. Rodriguez now petitions for review. We grant the petition and remand the case to the BIA for further proceedings consistent with this opinion.

Rodriguez entered the United States without inspection in 1986 and remained in the country for three years. He received a ten-year tourist visa in 1992 and thereafter made lawful entries in 1994 and 1995. After entering in 1995, he remained in the United States until 1997. Rodriguez received a second ten-year tourist visa in 2002, entitled B1/B2 visa and border-crossing card (border-crossing card). When he entered the United States on April 8, 2002, he settled in Rochester, Minnesota. According to Rodriguez, he has lived in Rochester with his family since that time, where he has owned and managed a grocery store. His wife of thirty years became a lawful permanent resident in 2009 and, according to Rodriguez, a United States citizen in 2015. Two of their children are United States citizens, and their third child is a lawful permanent resident.

Rodriguez testified that he traveled to Mexico in September 2004 to visit his father and stayed for approximately fifteen days. When he returned to the United States, Rodriguez flew from Mexico City to Tijuana. He entered the United States through the San Diego, California, port of entry, as a passenger in a truck, and, according to Rodriguez, immigration officials scanned his border-crossing card. He arrived in San Ysidro, California, on October 6, 2004. A replacement I-94 form confirms that Rodriguez entered the United States at the San Diego port of entry on October 6, 2004, and indicates that he was authorized to remain in the United States until April 3, 2005. Rodriguez maintains that he has not returned to Mexico since his 2004 visit and that he has remained in the United States since his lawful October 2004 entry.

Rodriguez was arrested in Rochester for driving while impaired on March 8, 2009. Two days later, the Department of Homeland Security (DHS) served Rodriguez with a Notice to Appear, charging him with being subject to removal under 8 U.S.C.

§ 1182(a)(6)(A)(i) for having entered the United States without inspection and without being admitted or paroled. The Notice to Appear alleged that Rodriguez had entered the United States without inspection "at or near San Ysidro, CA, on or about October 2005" and that he was "not then admitted or paroled after inspection by an Immigration Officer." Rodriguez first appeared in Immigration Court for a hearing on June 17, 2009, and was advised of the charges against him. He later retained counsel.

On November 13, 2009, the U.S. Citizenship and Immigration Services (USCIS) approved Rodriguez's daughter's petition for alien relative that she had filed on Rodriguez's behalf. Rodriguez thereafter moved to terminate removal proceedings so that he could adjust his status to that of a lawful permanent resident. Among the exhibits he attached to the motion was a copy of a document entitled, "TECS II - I-94 Arrival/Departure Display."[1] The document indicated that Rodriguez had entered the United States on October 6, 2004, and that he had departed by plane from Houston, Texas, at 2:24 p.m. on January 21, 2005, on Continental Airlines flight 1424.[2] The TECS-II document did not indicate any later entries into the United States.

---

[1]According to the government, "TECS is an updated and modified version of the former Treasury Enforcement Communications System that is owned and managed by the Customs and Border Protection ('CBP') agency, and is both an information sharing platform and a system of records for law enforcement data."

[2]There were three TECS-II exhibits admitted in this case. Exhibit 4 was a one-page document that Rodriguez submitted with his motion to terminate. Exhibit 14 was a one-page document that was offered by DHS. Exhibit 25 included six-pages of TECS-II information that Rodriguez had received from CBP in response to his Freedom of Information Act (FOIA) Request. The IJ and the BIA rejected Rodriguez's arguments that there were material differences in the three exhibits. We agree with that administrative determination, for each of the exhibits indicates an October 6, 2004, arrival and a January 21, 2005, departure. We will refer to the TECS-II exhibits as the "TECS-II document."

By written response dated January 4, 2010, DHS "advis[ed] the Immigration Court that [DHS] does not oppose respondent's motion seeking . . . to terminate this proceeding." The response was filed on January 7, 2010. The IJ, however, had denied Rodriguez's motion to terminate two days earlier, on January 5, 2010, stating, "The Notice to Appear alleges a different entry date and the [TECS-II document] reflects a departure date after the inspected admission. Facts need to be resolved."

The central dispute in Immigration Court thus became whether Rodriguez left the United States on January 21, 2005. As the government explained in its brief to this court, "a dispute arose as to whether Rodriguez's most recent entry into the United States was without being admitted or paroled, or if he had overstayed a prior lawful entry on October 6, 2004[,] and remained without having departed since that time." Resolution of this dispute was crucially important to Rodriguez, because if the IJ determined that Rodriguez left the country on January 21, 2005, and thereafter entered without inspection and without admission or parole, he would be deemed inadmissible and would be ineligible to adjust his status to that of a lawful permanent resident. See 8 U.S.C. §§ 1182(a)(6)(A)(1); 1255(a).

Rodriguez denied that he had entered the United States without inspection and without admission or parole. During a hearing on February 3, 2010, he requested a continuance to present to DHS evidence that he did not depart the United States on January 21, 2005. The parties discussed a Record of Deportable Alien (I-213) that was signed by Immigration Enforcement Agent Brad Burrows on March 10, 2009 (final I-213). The final I-213 stated, "SUBJECT claims to have last entered the U.S. on or about October 2005 at or near San Ysidiro [sic], CA. SUBJECT was not inspected or admitted by an Immigration Officer at a designated Point of Entry." Rodriguez argued that Agent Burrows did not speak Spanish very well and that Burrows wrote down that Rodriguez had entered the United States in October 2005 despite the fact that Rodriguez told Burrows that he had entered in October 2004 or 2005.

-4-

During the next hearing, on June 23, 2010, Rodriguez again denied both that he had departed on January 21, 2005, and that he had entered without inspection and admission or parole in October 2005. He argued that the TECS-II document was factually inaccurate and that he had provided DHS with documents that established his presence in the United States on January 21, 2005, and continuously thereafter. Counsel for the DHS agreed that the departure information set forth on the TECS-II document "appears to be the heart of the issue." DHS counsel also informed the IJ that the Mexican Consulate had notified DHS of another Francisco Rodriguez Quiroz, but that it refused to provide any further information about that person. After discussing some of the evidence, the IJ again continued the matter, scheduling time in August 2010 for a contested removal hearing.

Before the hearing, Rodriguez moved for the issuance of a subpoena, requesting that Agent Burrows be summoned to testify. The motion alleged that Burrows was the source of inaccurate information set forth in the Notice to Appear. DHS opposed the motion, arguing that the evidence was not essential to the resolution of the proceedings, because once Rodriguez admitted alienage, "the burden of proof shifted to [Rodriguez] to show time, place[,] and manner of entry." The IJ denied the motion, checking a box that stated, "The court agrees with the reasons stated in the motion." Also before the hearing, DHS submitted a witness list, requesting that Immigration Enforcement Agent Jennifer Williams be permitted to testify. According to DHS, Williams had "encountered [Rodriguez] . . . at the Olmstead [sic] County Jail on March 9, 2009" and would testify "as to statements made by [Rodriguez], specifically with regard to time, place[,] and manner of [his] last entry into the United States."

During the August 25, 2010, hearing, Rodriguez objected to the admission of the final I-213 that had been completed by Agent Burrows. He sought to cross-examine Burrows about the alleged errors in the document and establish that Burrows was not fluent in Spanish. The IJ admitted the exhibit, stating that Rodriguez could "present evidence relating to what information he disagrees with in the I-213" and that

"if [Rodriguez] is going to testify concerning the inaccuracies in the I-213, I'll have his direct testimony versus an I-213." The IJ also admitted a handwritten draft I-213 that was completed by Agent Williams on March 9, 2009 (draft I-213), and in which Williams had written that Rodriguez last entered the United States in September 2004, writing on the form, "Admit EWI." According to the IJ, "EWI is a well-known abbreviation for entry without inspection." The IJ denied Rodriguez's request that Williams be required to testify, and DHS did not call her as a witness.

The IJ reiterated that Rodriguez bore "the burden of establishing date, place, and manner of entry" and that because there was evidence that he had departed the United States on January 21, 2005, Rodriguez was required to prove "entry subsequent to that date." Rodriguez responded that he could not prove any subsequent entry "because he did not leave on that date." Instead, Rodriguez claimed that the documentary evidence he presented—including bank and medical records—established that he had remained in Rochester on January 21, 2005. The IJ and DHS counsel then engaged in the following exchange about DHS's evidence:

> [IJ:]  [A]ll the Government has is the, the [TECS-II] print-out and whatever you're going to offer as far as the testimony of the person who interviewed him in, in the prison or the jail?

> [A:]  That's right, Your Honor. . . . [My] perspective is the respondent appears to be utilizing the TECS record to demonstrate an entry in 2004, . . . the end goal in sight of being able to adjust status, and the question is if he rel[ies] on that entry in October of 2004, there is an exit associated with that date.

When asked what evidence established that Rodriguez lawfully entered the United States in October 2004, Rodriguez's counsel replied that the replacement I-94 form established a lawful entry. The IJ pointed out that a problem arose if the TECS-II document was the source of the information set forth in the I-94 because the TECS-II document also showed a departure. After some discussion, the IJ stated, "I think

-6-

we can safely say that he established that he entered with a border-crossing card on October 6, 2004. So he's got a lawful entry, but then we have to deal with this departure information . . . ." The IJ inquired about the source of the departure information set forth on the TECS-II document, since "the only thing that indicates he ever left . . . was that one entry [on the TECS-II document]." Specifically, the IJ asked DHS for an "explanation as to where this departure information comes from, who provides it, and what documentation is used to verify it so we can determine how reliable it is."

During the next hearing, held on September 29, 2010, DHS counsel stated that DHS would not be able to disclose the source of the TECS-II information, stating simply, "I believe that information is, is sensitive." The IJ responded that she "need[ed] to know how reliable [the TECS-II document] is." DHS counsel then argued that if the TECS-II document could be relied upon as proof of a lawful entry in 2004, then it ought to be considered as proof of departure in 2005. After some discussion about Rodriguez's efforts to secure documents from an airline regarding data included in the TECS-II database, the IJ said, "I need to know what the . . . Government does, where that information comes from that the Government uses. . . . It may not be the same thing that the airline does . . . ."

At the outset of the next hearing, held on October 6, 2010, Rodriguez's counsel confirmed that the IJ wanted to hear testimony regarding Rodriguez's admission into and his continuous presence in the United States. The IJ stated that she also "want[ed] to hear about the departure." After counsel said, "[W]e're here because of the TECS notation about a January 21, '05 departure," the IJ replied, "Correct." Accordingly, Rodriguez's testimony focused on the circumstances of his October 2004 entry and on establishing that he did not depart in January 2005. He did not testify regarding the draft or final I-213s.

Rodriguez testified that he did not depart the United States on January 21, 2005, and that he had never permitted anyone else to use his border-crossing card. Rodriguez also testified that his grocery store offered a check-cashing service and that he withdrew cash from his business's bank account approximately every other day in 2005. He produced handwritten deposit slips and counter-withdrawal forms from January 2005 and testified that he himself filled out the documents and made the deposits and withdrawals. He further testified that he was the only person authorized to withdraw funds from his business's bank account. Rodriguez submitted a post-hearing request for a subpoena, seeking the testimony of the manager of the bank where Rodriguez held an account for his business.

The IJ held a brief hearing on November 1, 2010, during which the parties discussed whether a subpoena for the bank manager should issue. Rodriguez submitted the report of a forensic document examiner who had evaluated two of Rodriguez's deposit slips, both dated January 21, 2005. The examiner concluded that it was "highly probable" that Rodriguez wrote the numerals appearing on the deposit slips. The report defined "highly probable" as being equal to "the legal level of 'proof beyond a reasonable doubt,'" with the examiner being "virtually certain" of her conclusion. Following the hearing, the IJ issued a subpoena compelling the testimony of the bank manager.

During a hearing on November 29, 2010, the bank manager testified regarding the bank's procedures for depositing and withdrawing funds. She testified that she knew Rodriguez as a regular customer and had witnessed his signature many times. According to her testimony, anyone can deposit funds into an account, but to withdraw funds using a counter-withdrawal form, the customer must sign the form in the presence of the teller at the time of the withdrawal. Before processing a withdrawal, the teller must verify that the individual is authorized to withdraw funds from the account. Accordingly, if the teller does not know the individual, the teller

must verify the individual's identity by checking a government-issued identification card.

The bank manager explained that tellers stamp deposit slips and counter-withdrawal forms with the time and date of the transaction. The time stamp indicates the time that the transaction occurred in the bank. The date stamp, however, indicates the date that the funds were deposited into or withdrawn from the account. Accordingly, because the bank does not process deposits and withdrawals when the Federal Reserve is closed, the date stamp for a deposit or withdrawal made on a Saturday reflects the next business day.

The bank manager reviewed copies of deposit slips and counter-withdrawal forms that Rodriguez had submitted to the bank in January 2005. Rodriguez had dated the deposit slips by hand, two of which had handwritten dates of January 21, 2005. The time and date stamps indicated that the bank processed the deposits on January 21 at 10:16 a.m. and 2:53 p.m.

The bank manager reviewed counter-withdrawal forms that had handwritten dates of January 19, 20, 22, and 24. The date stamps indicated that the withdrawals were processed on January 19, 20, 24, and 25, however. The bank manager explained that January 22, 2005, was a Saturday and that the date stamp indicated that the withdrawal was posted to the account on Monday, January 24, 2005. With respect to the form that was hand-dated January 24 and processed on January 25, however, the bank manager explained that Rodriguez may have had the date wrong. The bank manager also testified that, based on her familiarity with Rodriguez's signature, the signature on each of the counter-withdrawal forms was his. When asked on cross-examination if it was possible that Rodriguez misdated the counter-withdrawal form that had a handwritten date of January 22 but a date stamp of January 24, the bank manager responded, "It's a possibility, yes."

In early 2011, Rodriguez moved to compel DHS to provide information regarding how departures are entered into the TECS system. DHS responded that same day, stating that it was "not going to be able to provide information regarding the TECS II database." The IJ denied the motion to compel without comment.

The next hearing was held on May 23, 2011, at which Rodriguez objected to the admission of exhibit 14, which included a copy of the TECS-II screen that indicated a January 21, 2005, departure, arguing that it lacked foundation. DHS responded that the document spoke for itself and that the IJ could decide the weight to give the document. The IJ admitted the document and several other exhibits. To Rodriguez's counsel's surprise, the IJ determined during the hearing that "while there is ample evidence that the respondent was in the country both before and after the date of the departure reflected in the Government's records, there isn't any evidence that he was present in the United States on that [January 21, 2005,] date, and the fact that there is a departure and no subsequent reentry is sufficient for me to sustain the, the charge." The IJ later reiterated, "[M]y finding is he left. So he's got the burden to show that he came – how he entered after that date." Approximately two weeks later, Rodriguez filed a motion to reopen the record so that he could present additional evidence.

Two years passed before the next hearing, which the IJ had scheduled to allow Rodriguez to present "testimony from [his] witnesses who ha[d] not been given an opportunity to testify." At the beginning of the May 16, 2013, hearing, Rodriguez's counsel listed the witnesses he planned to call and stated that he also "would, if possible, like to take testimony from [Rodriguez]," to which the IJ responded, "We already did his testimony. I don't want to go back and, and redo things that were done. . . . . I wanted to make sure the record was complete [by] having the respondent's witnesses all be able to testify." Thereafter, Rodriguez's business partner and Rodriguez's wife testified that Rodriguez had not departed the United

States since October 6, 2004.[3] When asked whether Rodriguez could have left the United States and not informed his business partner, the business partner replied, "Well, everything is possible." The IJ also admitted several exhibits during the hearing, including Rodriguez's application for adjustment of status and the third-party checks that made up the entries set forth on the January 21, 2005, bank deposit slips.

In its January 22, 2014, decision, the IJ determined that Rodriguez was subject to removal, concluding that Rodriguez "ha[d] failed to establish that he [was] present in the United States pursuant to a prior admission because he fail[ed] to meet with clear and convincing evidence that he did not actually depart subsequent to a prior admission." The IJ stated that she had "two problems" with Rodriguez meeting his burden of proof: First, the IJ determined that relying on the TECS-II document as evidence of a lawful entry, but not as evidence of a subsequent departure was problematic in light of the paucity of evidence "pointing to believing or not believing the record in its entirety." Second, the IJ determined that Rodriguez had failed to establish that he did not depart after a lawful admission, stating, "While there is evidence that [Rodriguez] was in the country prior to and subsequent to January 21, 2005, there is no evidence which the Court finds to be clear and convincing that he was in fact present on January 21, 2005." In other words, the IJ relied on the entry information and the departure information set forth in the TECS-II document and rejected Rodriguez's argument that the TECS-II document was accurate only as to his October 2004 entry. Ultimately, the IJ determined that, despite a voluminous record, "looking at the evidence that directly relates to entries and departures, there is basically nothing other than the one record that both parties rely on to support their case." The IJ thus sustained the charge of inadmissibility, denied the application for adjustment of status, and granted Rodriguez's request for voluntary departure.

---

[3]Rodriguez's wife's testimony was confusing and not entirely consistent. The IJ fairly determined that it was "not . . . completely reliable."

-11-

Rodriguez appealed to the Board of Immigration Appeals (BIA), which dismissed his appeal, agreeing with the IJ that Rodriguez had failed to show by clear and convincing evidence that he was present in the United States pursuant to a lawful admission.

The BIA rejected Rodriguez's claim that he had not left the United States since his October 2004 entry. In doing so, the BIA cited the TECS-II document as evidence that Rodriguez departed on January 21, 2005, and the draft and final I-213s as evidence that he had entered the United States without inspection. After stating that "in general, information contained on government documents is inherently trustworthy and admissible," the BIA determined that the evidence supported both a finding that Rodriguez was inspected and admitted in 2004 and a finding that Rodriguez left the United States in 2005.

The BIA briefly recounted the evidence that Rodriguez was present in the United States on January 21, 2005, including the testimony of his business partner, his wife, and Rodriguez himself, and the evidence that Rodriguez had "visited the bank on the days surrounding his alleged January departure." Nevertheless, the BIA discerned no error in the IJ's determination that "the evidence of record provided clear and convincing evidence that [Rodriguez] departed on January 21, 2005, and that he was not admitted thereafter."

The BIA also indicated that the IJ could have considered the draft and final I-213s as evidence that Rodriguez entered without inspection, but that the IJ instead decided to consider those documents only "in conjunction with" Rodriguez's departures from the United States that pre-dated the alleged January 21, 2005, departure. The BIA rejected Rodriguez's argument that Agent Burrows incorrectly recorded October 2005 as the date Rodriguez last entered, and it determined that the differences between the draft and final I-213s "[did] not detract significantly from the [final I-213's] inherent trustworthiness." Ultimately, the BIA determined that

-12-

Rodriguez suffered no prejudice by not having an opportunity to testify about those documents, stating:

> In any event, the Immigration Judge consider[ed] these forms only in conjunction with earlier departures made by [Rodriguez], not the one in January of 2005, material to this case. As these documents were not material to this entry [sic], the respondent was not prejudiced by not having an opportunity to testify concerning their preparation.[4]

Rodriguez's appeal was dismissed on June 30, 2015. Rodriguez timely filed a petition for review.

"We review the BIA's legal determinations *de novo*, but we accord substantial deference to the BIA's interpretation of the statutes and regulations it administers." Etenyi v. Lynch, 799 F.3d 1003, 1006 (8th Cir. 2015) (quoting Garcia-Gonzalez v. Holder, 737 F.3d 498, 500 (8th Cir. 2013)). We will not disturb the BIA's findings of fact unless they are unsupported by substantial evidence, id., for "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Goswell-Renner v. Holder, 762 F.3d 696, 699 (8th Cir. 2014). In cases like this one, where the BIA adopts the findings and reasoning of the IJ, we review the two decisions together. Etenyi, 799 F.3d at 1006.

As set forth above, Rodriguez had applied to adjust his status to that of a person admitted for permanent residence after his daughter's petition for alien relative had been granted by USCIS. Under 8 U.S.C. § 1255(a), "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General . . . to that of an alien lawfully admitted for permanent residence if," among other things, the alien "is admissible to the United States for permanent residence." Accordingly, as relevant here, the statute permits the adjustment of

---

[4]We assume the BIA meant to write "departure" not "entry."

Rodriguez's status so long as he "was inspected and admitted or paroled" and was admissible. See id.

The notice to appear charged that Rodriguez was inadmissible, however, as an alien present in the United States without being admitted or paroled. See id. § 1182(a)(6)(A) ("An alien present in the United States without being admitted or paroled . . . is inadmissible."). Rodriguez admitted that he was a citizen of Mexico, which satisfied the government's burden of establishing Rodriguez's alienage. 8 C.F.R. § 1240.8(c). The burden of proof thereafter shifted to Rodriguez to establish by clear and convincing evidence that he was "lawfully present in the United States pursuant to a prior admission." 8 U.S.C. § 1229a(c)(2)(B); 8 C.F.R. § 1240.8(c).

This appeal centers on the IJ's determination that Rodriguez failed to prove by "clear and convincing [evidence] that he was in fact present on January 21, 2005." Whether Rodriguez was present on January 21, 2005, is a finding of fact and is thus conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. The TECS-II document was the only evidence that the IJ relied upon in finding that Rodriguez had departed the United States on January 21, 2005. As set forth earlier, the TECS-II document indicated that Rodriguez departed by plane from Houston, Texas, at 2:24 p.m. on January 21, 2005, on Continental Airlines flight 1424. The government urges us to grant the TECS-II document a "presumption of regularity" because it "provided information from government records prepared by public officials." The government describes TECS-II documents as "presumptively reliable" because they are "produced by public officials during the ordinary course of their duties." See Kim v. Holder, 560 F.3d 833, 836 (8th Cir. 2009) (determining that certain evidence was "presumptively reliable as produced by public officials during the ordinary course of their duties").

While the record supports the assertion that a public official printed the TECS-II document from a government computer system,[5] it does not necessarily support an assertion that the departure information derived from a public official or from government records. As set forth above, DHS provided no foundation for the TECS-II document, despite the IJ's request for an explanation of how the departure information came to be recorded in the TECS system and the IJ's comment that she would not be able to assess the reliability of the departure information without such an explanation. Moreover, Rodriguez had asserted that the information may have originated from the air carrier and not from any public official. Rodriguez's concern seems to be well founded in light of entries in the Federal Register indicating that air carriers report itinerary information of certain passengers to Customs and Border Protection (CBP), which then maintains that information in the TECS system. See Privacy Act of 1974; U.S. Customs and Border Protection—Border Crossing Information; System of Records, 73 Fed. Reg. 43,457-01 (July 25, 2008) (giving notice that CBP established a system of records to "receive and maintain border crossing information on travelers who are admitted or paroled into the United States," that the information includes "certain itinerary information provided by air and sea carriers," and that the maintenance of the border crossing information previously was covered by a "system of records notice" called Treasury Enforcement Communications System (TECS)); Privacy Act of 1974, as Amended: System of Records, 66 Fed. Reg. 52,984-01 (Oct. 18, 2001) (stating that TECS contains "[e]very possible type of information from a variety of Federal, state[,] and local sources").

In contrast to DHS's refusal to provide any information regarding how air departures are entered into the TECS system, the government has explained in detail the procedure for recording license numbers of vehicles passing through the border by land. In United States v. Puente, 826 F.2d 1415, 1417 (5th Cir. 1987), for example,

---

[5]Rodriguez received a copy of the TECS-II document pursuant to a FOIA request, for example.

the government submitted evidence that explained how the "TECS computer printouts" in that case were generated:

> The Customs Service requires its employees to record in the TECS system the license plate number of every vehicle coming into the United States from Mexico at the Eagle Pass border checkpoint. As the automobile approaches the checkpoint, a Customs Service official routinely enters the license plate number into the TECS computer; . . . . If the computer search reveals no information [suggesting the vehicle should be stopped], the automobile is allowed to proceed through the checkpoint. As the vehicle passes the official operating the TECS computer, that person verifies that the correct license number has been entered in the system by matching the license number on the automobile with that displayed on the computer screen. All the entries into the TECS system are later stored in a central system and retrieved as needed . . . .

See United States v. Orozco, 590 F.2d 789, 793 (9th Cir. 1979) (describing CBP's procedure as "a relatively simple one," involving a customs inspector entering license numbers into the computer); see also United States v. Cabrera-Beltran, 660 F.3d 742, 750-53 (4th Cir. 2011) (citing Orozco and Puente and concluding that TECS records "show[ing] that the defendant . . . crossed the border on certain dates and in certain vehicles" were not testimonial). Because the departure information set forth in the TECS-II document may not have been "produced by public officials during the ordinary course of their duties," and because DHS refused to explain how that information came to be recorded in the TECS system, we question whether the January 21, 2005, departure information set forth in the TECS-II document is entitled to a presumption of reliability.

Even assuming that the departure information was presumptively reliable, we are not sure what more Rodriguez could have done to rebut the presumption. Rodriguez presented two bank deposit slips on which he handwrote January 21, 2005; the bank time-stamped those slips 10:16 and 2:53, respectively; and the bank date-stamped those

-16-

slips January 21, 2005. Although the bank manager testified that anyone can make a deposit, Rodriguez testified that, at that time, he was the only person who deposited funds into his business's bank account. The handwriting on those deposit slips appears to be the same as the handwriting on the counter-withdrawal forms that Rodriguez had signed in the presence of a teller, and a handwriting expert opined that the handwriting on the deposit slips was Rodriguez's. Moreover, Rodriguez submitted copies of the third-party checks that made up the January 21, 2005, deposits. Those checks, some of which were dated January 21, 2005, appear to be mostly paychecks issued by businesses to employees. With respect to the third-party checks dated January 21, 2005, we can reasonably infer the following: the employer issued a paycheck to its employee, who cashed the check at Rodriguez's grocery store on the very day it was received; after cashing the employee's paycheck, Rodriguez then brought those checks to the bank, where he completed a deposit slip and recorded by hand the amount of each check, deposited the funds in his business account, and the teller stamped his deposit slips January 21, 2005. The IJ did not address this evidence, however, except to say that Rodriguez "provided evidence relating to bank deposits and withdrawals around January 21, 2005, in an effort to establish he was present to make deposits and withdrawals and could not have left the country." The BIA similarly dismissed the evidence. See Gutierrez-Rostran v. Lynch, 810 F.3d 497, 500 (7th Cir. 2016), *petition for cert. filed*, 84 U.S.L.W. 3589 (U.S. Apr. 8, 2016) (No. 15-1266) ("Neither the immigration judge nor the . . . Board of Immigration Appeals gave a reason for doubting the weight or truthfulness of the evidence . . . . Admissible, pertinent, credible evidence can't just be ignored . . . ; reasonable grounds must exist, and be articulated to justify rejection of such evidence."). By virtue of this evidence showing that he was in Rochester, any reasonable adjudicator would be compelled to find that Rodriguez rebutted any presumption of reliability accorded the information set forth in the TECS-II document that he departed the United States by plane from Houston at 2:24 p.m. on January 21, 2005.

The TECS-II document was the only evidence of a January 21, 2005, departure. Because Rodriguez rebutted any presumption of reliability that might otherwise be accorded that information, and because DHS has declined to provide any foundation for the departure information, the record is devoid of any reliable evidence that Rodriguez left on January 21, 2005. We thus conclude that the administrative finding that Rodriguez departed on that date is unsupported by substantial evidence.

We turn then to the draft and final I-213s, which the government argues constitute evidence that Rodriguez told two different immigration officers that he entered without inspection. According to the BIA, the IJ did not rely upon either the draft or the final I-213 as evidence that Rodriguez departed on January 21, 2005, and thus he was "not prejudiced by not having an opportunity to testify concerning their preparation." The BIA relied upon those documents, however, as "indicat[ing] the respondent entered the United States without inspection."

Form I-213s have long been considered reliable evidence. "Absent any indication that a Form I-213 contains information that is incorrect . . . , that document is inherently trustworthy and admissible as evidence to prove alienage and deportability." Matter of Barcenas, 19 I. & N. Dec. 609, 611 (BIA 1988). As set forth above, the final I-213 states that Rodriguez "claim[ed] to enter the U.S. on or about October 2005 at or near San Ysidiro [sic], CA." Rodriguez has maintained throughout these proceedings that he last entered lawfully in October 2004 at San Ysidro; that he told Agent Burrows that he entered in October 2004 or 2005; and that Burrows did not speak Spanish well. The final I-213 also states that Rodriguez "was not inspected or admitted by an Immigration Officer at a designated Point of Entry." Despite the government's assertion that Rodriguez told Burrows that he had entered without inspection, the source of the information is unclear from the face of the document. The final I-213 does not attribute that statement to Rodriguez, unlike many other statements in the document. Although the government's assertion may be correct, it is equally plausible that Burrows copied that information from the draft I-213 or deduced that

Rodriguez had entered without inspection from the arrival and departure information set forth in the TECS system.

The draft I-213 bears a handwritten note that says, "Admit EWI." The government asserts that the notation indicates that Rodriguez told Agent Williams that he had entered without inspection. While that may be a correct interpretation, the draft I-213 also states that Rodriguez last entered the United States in September 2004, a date that precedes Rodriguez's lawful October 2004 entry and differs from the October 2005 date set forth in the final I-213 and alleged in the Notice to Appear. There is no evidence to explain the inconsistencies between the draft and final I-213s.

The government argues that the lack of evidence means that Rodriguez failed to rebut the presumption of reliability that applies to the final I-213. The BIA acknowledged, however, that Rodriguez was not given an opportunity to present evidence regarding the preparation of the draft or final I-213s. The IJ denied Rodriguez's request to subpoena Agent Burrows, did not permit Rodriguez to call Agent Williams to testify, and indicated at the October 6, 2010, hearing that Rodriguez's testimony should focus on whether he departed on January 21, 2005. The IJ then denied Rodriguez's request to testify during the May 16, 2013, hearing, limiting the hearing to testimony by Rodriguez's witnesses. Rodriguez thus did not have an opportunity to rebut the statements in the final I-213 that he had entered without inspection in October 2005 or the "[a]dmit EWI" notation in the draft I-213.

We reject the BIA's conclusion that Rodriguez "was not prejudiced by not having an opportunity to testify concerning [the draft and final I-213s] preparation." It would be fundamentally unfair to rely on those documents as the only evidence that Rodriguez entered without inspection in the absence of an opportunity for Rodriguez to present evidence concerning the manner in which they were prepared. See Nyama v. Ashcroft, 357 F.3d 812, 816 (8th Cir. 2004) (per curiam) ("The sole test for admission of

evidence is whether the evidence is probative and its admission is fundamentally fair." (citation omitted)).

We question whether a reasonable adjudicator could conclude that Rodriguez did not meet his burden of establishing by clear and convincing evidence that he was lawfully present pursuant to a prior admission.[6] Rodriguez presented substantial documentary evidence that he remained in the United States throughout 2005, with the IJ and the BIA relying on the TECS-II document as evidence that he had departed from the United States. Once the TECS-II document is set aside, the record contains no evidence of a departure from the United States, leaving the draft and final I-213s as the only evidence that Rodriguez entered the United States without inspection and without admission or parole. The draft and final I-213s set forth different entry dates and—according to the BIA—"have several other differences as well." Accordingly, we remand the case for the limited purpose of allowing Rodriguez to present evidence regarding the draft and final I-213s.

The petition for review is granted, and the case is remanded for further proceedings consistent with this opinion. We retain jurisdiction should there be another appeal.

_____

[6]The government has argued that if Rodriguez last entered lawfully in October 2004, he overstayed his visa and thus cannot show that he "is lawfully present," as required by 8 U.S.C. § 1229a(c)(2)(B). The government has either forfeited or waived this argument by failing to raise it below. See Thiam v. Gonzales, 496 F.3d 912, 914 n.1 (8th Cir. 2007) ("Ordinarily, we do not consider an argument raised for the first time on appeal." (citation omitted)).