FINDINGS OF FACT AND CONCLUSIONS OF LAW
Carol A. Doyle, United States Bankruptcy Judge *364 Ira Bodenstein, the chapter 7 trustee of Peregrine Financial Group, Inc., filed this adversary proceeding against the University of Northern Iowa ("University"). He seeks to recover an alleged fraudulent transfer of $500,000 made to the University from funds in a Peregrine bank account containing customers' segregated funds. A trial was held on June 18 and 19, 2018. The following are the court's findings of fact and conclusions of law. Judgment will be entered in favor of the University on both of the trustee's claims.
I. Jurisdiction and Authority to Enter Final Judgment
Based on the trial briefs submitted before trial, the parties seem to agree that the bankruptcy court should not enter a final judgment on a fraudulent transfer action unless all parties consent. The trustee consented but the University refused to consent. At the beginning of trial, the court assumed that the parties were correct and stated its intention of sending proposed findings of fact and conclusion of law to the district court. Upon further consideration of the issue, however, the court has concluded that the claims in this case are within its core jurisdiction and that the court has the constitutional authority to enter a final judgment.
Congress explicitly authorized bankruptcy courts to enter final judgments resolving disputes over fraudulent conveyances. 28 U.S.C. § 157(b)(2)(H) ("Bankruptcy judges may hear and determine all ... core proceedings arising under title 11 ... and may enter appropriate orders and judgments ...[in] ... proceedings to determine, avoid, or recover fraudulent conveyances ..."). In 2011, the Supreme Court held that a non-Article III bankruptcy court does not have the constitutional authority to enter a final judgment on a state law counterclaim that is not a part of the bankruptcy claims process despite the bankruptcy court's statutory authority under 28 U.S.C. § 157(b)(2)(C). Stern v. Marshall , 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).
Since Stern , courts have grappled with whether bankruptcy courts may enter final judgments in other core proceedings explicitly enumerated in § 157(b)(2), including fraudulent transfer cases. This court agrees with the many courts that read Stern narrowly and conclude that bankruptcy courts have the constitutional authority to enter final judgments in fraudulent transfer proceedings. See, e.g., Reid v. Wolf (In re Wolf ), No. 16 A 00066, 2018 WL 2386813 (Bankr. N.D. Ill. May 24, 2018) ; Clay v. City of Milwaukee (In re Clay ), No. 14 A 2315, 2015 WL 3878454 (Bankr. E.D. Wis. June 19, 2015) ; Mason v. Ivey , 498 B.R. 540, 546 (M.D.N.C. 2013) ; KHI Liquidation Trust v. Wisenbaker Builder Services, Inc. (In re Kimball Hill, Inc. ), 480 B.R. 894 (Bankr. N.D. Ill. 2012) ; Andrews v. RBL, LLC (In re Vista Bella, Inc. ), No. 12 A 00060, 2012 WL 3778956, at *2 (Bankr. S.D. Ala. Aug. 30, 2012) ; Gugino v. Canyon Co. (In re Bujak ), No. 11 A 6038, 2011 WL 5326038, at *4 (Bankr. D. Idaho Nov. 3, 2011) ;
*365 Liberty Mutual Insur. Co. v. Citron (In re Citron ), No. 09 A 8125, 2011 WL 4711942, at *1 (Bankr. E.D.N.Y. Oct. 6, 2011). As the Kimball Hill and Clay courts noted, an action under § 548 and § 550 is a claim created by a federal statute-not a counterclaim based on state law-that reflects claims that have been part of insolvency proceedings since 1570. Kimball Hill , 480 B.R. at 906 ; Clay , 2015 WL 3878454, fn. 1. The Supreme Court itself stated in Stern that "the question presented here is a 'narrow' one ... [and that] Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984." Stern , 564 U.S. at 502, 131 S.Ct. at 2620.
Some courts in this circuit have concluded that bankruptcy courts do not have the authority to enter final judgments in fraudulent transfer proceedings. See FTI Consulting, Inc. v. Merit Management Group, LP , 476 B.R. 535 (N.D. Ill. 2012) ; Paloian v. American Express Co. (In re Canopy Financial, Inc. ), 464 B.R. 770 (N.D. Ill. 2011). They adopted a broad reading of Stern as well as Granfinanciera, S.A. v. Nordberg , 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) that is not mandated by either decision.
In Granfinanciera, the Court found that a defendant in a fraudulent transfer adversary proceeding who had not filed a proof of claim in the debtor's bankruptcy case was entitled to a jury trial under the Seventh Amendment to the United States Constitution. The Court expressly identified all the issues it was not deciding, including: (1) whether bankruptcy courts may conduct jury trials in fraudulent conveyance suits brought by a trustee against a person who has not filed a claim against the estate; (2) if Congress has authorized bankruptcy courts to hold jury trials in fraudulent conveyance actions, whether that authority would comport with Article III; and (3) whether a jury trial conducted by a bankruptcy court would satisfy the Seventh Amendment. 492 U.S. at 50, 109 S.Ct. at 2794-95. "The sole issue before us is whether the Seventh Amendment confers on petitioners a right to jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them. " Id. (Emphasis added.) Thus, the Court did not address the constitutional authority of a bankruptcy court to enter a final judgment on a fraudulent transfer claim after holding a bench trial. The district courts in FTI Consulting and Canopy Financial applied Granfinanciera and Stern expansively. This court adopts a more narrow interpretation consistent with the Stern observation that its holding is limited to one isolated issue and will not have a significant impact on bankruptcy proceedings.
The Supreme Court's more recent decision in Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.) , 573 U.S. 25, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014), does not require a different result. The Court held that when a bankruptcy court hears a Stern claim-one that bankruptcy courts are statutorily but not constitutionally authorized to adjudicate-it is treated like a non-core, related claim. The bankruptcy court should therefore issue proposed findings of fact and conclusions of law to be reviewed de novo by the district court. 134 S.Ct. at 2168. The Arkison Court expressly stated that it assumed without deciding that the fraudulent transfer claims in the case were Stern claims, presumably because resolving the issue would not affect the result. Either way, the bankruptcy court could hear the claims and enter findings, as it had done in that case. 134 S.Ct. at 2174.[1] Arkison does *366 not preclude this court from entering a final judgment in this case.
Under Rule 52 of the Federal Rules of Civil Procedure (applicable here under Rule 7052 of the Federal Rules of Bankruptcy Procedure ), the court must make findings of fact and conclusions of law in an action "tried on the facts without a jury." Fed. R. Bankr. P. 7052. The court will therefore enter these findings of fact and conclusions of law.[2] Under 28 U.S.C. § 157(b)(2)(H), the court will also enter a separate final judgment in this adversary proceeding. If any reviewing court concludes that the bankruptcy court does not have the constitutional authority to enter a final judgment without the consent of all parties, the findings below may be considered as proposed findings of fact and conclusions of law.
II. Findings of Fact
The court makes the following findings of fact based on the stipulations of the parties and the evidence presented at trial:
1. Peregrine Financial Group Inc. was a futures commission merchant ("FCM") registered with the U.S. Commodity Futures Trading Commission ("CFTC"). Stipulation No. 7. It was regulated under the Commodity Exchange Act ("CEA") and regulations of the CFTC. Its customers traded futures contracts and other financial products.
2. As an FCM, Peregrine was required by the CEA and CFTC regulations to maintain at least one bank account for funds deposited by its commodity futures customers for commodity futures trading and to keep those funds segregated from its operating funds. Stipulation No. 10. The parties refer to these funds as "segregated funds." Though the segregated funds were held in a bank account owned by Peregrine, it did not own these funds; they were held solely for the benefit of its customers.
3. Russell Wasendorf Sr. was the Chief Executive Officer and Chairman of the Board of Peregrine. Stipulation No. 8. He committed massive fraud on Peregrine, its customers, the CFTC, and the National Futures Association ("NFA"), a self-regulatory association for the commodities industry. He stole over $200 million in customer segregated funds over a period of approximately 20 years. PX 12, Wasendorf Plea Agreement, p. 4-5.
4. Wasendorf's fraud was discovered in July 2012, after which Peregrine filed a chapter 7 bankruptcy case. Ira Bodenstein was appointed the chapter 7 trustee in the case.
5. Wasendorf stole funds primarily from one Peregrine account with US Bank holding customer segregated funds: account number 621011845 ("the 1845 account").
6. Wasendorf accomplished this fraud by personally receiving the bank statements in paper from US Bank and then creating falsified bank statements that were presented to Peregrine employees, the CFTC, and the NFA.
7. In September 2012, Wasendorf pled guilty to multiple crimes through a plea agreement. PX 12.
8. Wasendorf attended the University. In September 2009, he entered into an agreement under which he and his wife, *367 Connie Wasendorf, pledged to pay the University of Northern Iowa Foundation ("Foundation") $2 million over the course of four years for the purpose of funding the athletics program at the University. In the pledge agreement, PX 3, the Wasendorfs agreed to pay $500,000 immediately and to make additional $500,000 payments before December 2010, December 2011, and December 2012. The pledge agreement states, "Recognizing the importance of private support to the continued excellence of the University of Northern Iowa, I/we make the following pledge to the University of Northern Iowa Foundation: A commitment of $2,000,000.00." PX 3. The agreement also states: "This gift is designated for the Panther Athletics VIP Fund," followed by a handwritten notation of the Foundation's internal account number for the Panther Athletics VIP Fund-"222331/11."
9. The Wasendorfs made the first payment on their pledge by a check made payable to "UNI Athletics VIP Fund" in the amount of $500,000 dated October 1, 2009. PX 2. The notation on the bottom of the check appears to say "Scholarship Endowment Fund." The check is signed by Connie Wasendorf.
10. The second payment was made through a cashier's check drawn on US Bank in the amount of $500,000 dated November 15, 2010 that was payable to "UNI Foundation." DX 3. The "purpose/remitter" line says "Russell Wasendorf Sr."
11. On December 13, 2011, Wasendorf went into a branch of US Bank in Cedar Falls, Iowa, where the University is located. He signed a "counter withdrawal" slip on the 1845 account to withdraw $500,000 from it. PX 10. He requested that the funds be used to issue a cashier's check made payable to the "University of Northern Iowa" in the amount of $500,000.
12. Wasendorf was an officer of Peregrine and a person authorized to make withdrawals from the 1845 account. After the bank confirmed that he had sufficient proof of identity, he was authorized to withdraw from the account, and there were sufficient funds in the account, it debited the 1845 account in the amount of $500,000 and immediately credited the bank's own account from which it issues checks it guarantees, including cashier's checks, in that same amount. The bank then immediately issued a cashier's check from its guaranteed funds account in the amount of $500,000. The cashier's check listed only one payee: "University of Northern Iowa." The teller gave the cashier's check to Wasendorf.
13. Jeanette Duenas, an Operations Manager for US Bank, testified credibly at trial about the processes and procedures involved when a counter withdrawal slip is used at a branch of the bank. A party authorized to withdraw from an account may receive cash or a cashier's check using a counter withdrawal slip. In this case, Wasendorf did not request cash, and he could not have received such a large amount of cash by merely walking into a branch and requesting it. Duenas explained that a branch normally would not have that much cash available and various banking regulations would apply to such a large withdrawal of cash. Wasendorf also did not ask that funds be transferred to any accounts he held personally or through his other businesses at the bank. Instead, he asked for a cashier's check made payable to the University.
14. Duenas credibly testified that the funds for the cashier's check were transferred directly from the 1845 account of Peregrine into the bank's own guaranteed funds account, and then the cashier's check was issued on that account. Wasendorf never possessed the funds personally and *368 the funds were not first transferred to any account held personally by Wasendorf or one of his other businesses.
15. The University argued that there were two completely separate transactions involved-the withdrawal of money from the 1845 account and then the transfer into the bank's account for the issuance of the cashier's check. The court finds that this was one transaction. As Duenas credibly explained, for every debit entry there must be an immediate corresponding credit entry. Here, the debit was from Peregrine's 1845 account and the immediate offsetting credit was to the bank's guaranteed funds account. The court finds that these required offsetting entries were not two separate "transactions" in which the funds were first transferred to Wasendorf personally and then to the University. Instead, it was a single transaction by which funds from the 1845 account were used to purchase the cashier's check payable to the University.
16. Once the cashier's check was issued in the name of the University, Wasendorf could not cash it. If Wasendorf had changed his mind or left the branch before the cashier's check was issued to the University, as Duenas credibly testified, the bank would have merely reversed the original transfer and transferred the $500,000 back from the bank's guaranteed funds account into the 1845 account. Wasendorf would not have received the funds personally. Thus, Wasendorf never held the $500,000 in his own name. Instead, he acted as an officer of Peregrine and signatory for Peregrine on the 1845 account to have a check payable to the University issued from funds in the 1845 account.
17. The cashier's check issued by US Bank payable to the order of the University had a notation on it below the "Pay to the order of" line stating: "Purpose/Remitter: Russell Wasendorf Sr." PX 4. Duenas credibly explained that this line is meaningless on a US Bank cashier's check and does not reflect in any way the source of the funds used to purchase the check. The bank will put anything on that line that the customer wants, including a greeting like "congratulations." It is not an indicator of who provided the money that funded the cashier's check. This line on the cashier's check does not reflect that Russell Wasendorf personally owned the funds that were used to purchase the check. He did not.
18. Wasendorf left the US Bank branch on the morning of December 13, 2011 with the cashier's check made payable to the University. The cashier's check was then delivered by unknown means to the campus of the University, where both the University and the Foundation maintains their offices. The check somehow made its way to the office of the Foundation on the campus, where someone noticed that it was made payable to the University, not the Foundation.
19. A student employee who worked in the accounting office of the Foundation at that time brought the check over to Gary Shontz, who was then the Treasurer of the University (as well as one of the Vice Presidents of the Foundation). In accordance with his usual practice when a check for a donation was made payable to the University, Shontz had his secretary stamp the back of the check with language that endorsed the check over from the University to the Foundation. The endorsed check was then delivered to and deposited by the Foundation.
20. Shontz was familiar with the pledge made by the Wasendorfs to the Foundation for the Panther Athletics VIP Fund and assumed that this check made payable to the University was intended to satisfy that pledge to the Foundation. William Calhoun, who was then the president of the Foundation, was also familiar with the *369 Wasendorfs' pledge for the Panther Athletics VIP Fund. He also assumed that this cashier's check was intended by Wasendorf to satisfy his obligation to pay the Foundation $500,000 in or before December of 2011.
21. As both Shontz and Calhoun testified, the Foundation was established to solicit, hold, and manage funds donated for the benefit of the University. For various reasons, the University chose not to hold funds donated for its benefit. Instead, the Foundation was established as an independent, private foundation to keep and manage the funds. When donors indicated an intention to make donations to benefit the University, they were strongly encouraged to make the donation to the Foundation.
22. The Foundation and the University have a very close relationship. The Foundation has about 30 employees but a number of them, including Shontz and Calhoun, were employed by both the University and the Foundation. Some of the Foundation employees are "leased" from the University.
23. The Foundation maintains all donations in accounts owned solely by it that are now managed by an outside financial manager, not employees of the Foundation. The Foundation assesses a "fee" against every donation, generally between 3% and 5% of the donation, that the Foundation uses to fund its own operations.
24. When a donation is received, the Foundation takes its "fee" and then invests the rest in the investment pool managed by the outside investment managers. All the donated funds are pooled and invested in various ways. The amount actually held by the Foundation changes based on fluctuations in the various markets in which the assets are invested. Thus, when the economy deteriorated in 2008, the assets of the Foundation decreased significantly.
25. Although the Foundation invests all the donated funds in one investment pool and not in separate accounts, it maintains over 800 internal accounts or "designations" for the various donations. In this case, a separate account or "designation" was established for the Panther Athletics VIP Fund, which had a designation number of 222331/11. The Wasendorfs were the primary donors to this fund but approximately $100,000 was received for this fund from other donors.
26. The Foundation is a separately organized entity that has tax-exempt status under § 501(c)(3) of the Internal Revenue Code but it exists only to serve the University. Once a donation is made and the Foundation's fee is deducted, the Foundation is required to spend the donations only for the benefit of the University and in accordance with the donor's intent.
27. To accomplish this goal, the Foundation has set up procedures under which employees of the University can spend the funds. Employees who are authorized to access donated funds must submit a requisition form to the Foundation requesting payment for a particular expense. The authorized employee must also submit an invoice from the vendor of the product or service they wish to purchase. The Foundation reviews the request for only two criteria: (1) whether the donation fits within the donor's intent for the donated funds, and (2) whether there is enough money available in the particular "fund" to make the purchase or payment. As Calhoun testified, there are no other reasons that would justify the Foundation refusing to allow the appropriate University employees to spend money in the various donated funds accounts. The Foundation must approve the request and pay the submitted invoice if these two criteria are met.
28. The University, the Foundation, and the University of Northern Iowa *370 Alumni Association entered into an agreement in May 2002 governing their dealings with each other regarding donations and related matters. It is entitled "Service Agreement Between The University of Northern Iowa Foundation, the University of Northern Iowa Alumni Association and the University of Northern Iowa" ("Service Agreement"). DX 6. The Service Agreement recognizes that the Foundation exists for the "express purpose of advancing the causes of education and to that end promoting the welfare of the University of Northern Iowa and of its faculty, graduates, students and former students." DX 6, Recital F. It further provides that the "University desires to reaffirm that the Foundation is the official fundraising organization for the University." DX 6, Recital D. Recital I of the Service Agreement states that the Foundation is an independent contractor and not an agent of the University, but Paragraph 2.5.1 also expressly provides that, with respect to funds donated to the University, "[A]t its discretion, University shall designate Foundation as its agent to hold and manage funds donated to and solely in the name of the University." DX 6, ¶ 2.5.1.
29. Paragraph 3.4 of the Service Agreement provides, among other things, as follows: "If the Foundation is the intended recipient of funds made payable to the University, the funds shall first be immediately transferred to the Foundation." PX 6, Par 3.4. This provision is consistent with the long-standing policy and practice of the University and the Foundation. As Shontz and Calhoun credibly testified, both the University and the Foundation agree that donated funds should go to the Foundation, not the University. Donors often make mistakes and make donation checks payable to the University. The University virtually always immediately endorses those checks over to the Foundation. When Shontz worked for the University and the Foundation, he endorsed checks over to the Foundation about once per week, as reflected in DX5, a log he had his staff maintain of checks made payable to the University that were endorsed over to the Foundation. The $500,000 cashier's check at issue in this case is listed in the log.
30. Although the Wasendorfs agreed to pay the Foundation, they intended the funds to benefit the Athletics Department of the University. The pledge agreement expressly recognizes the "importance of private support to the continued excellence of the University of Northern Iowa." The president of the University expressly recognized that the donation made to the Foundation was intended to benefit the University. PX 5. In thanking Wasendorf for the gift to the Panther Athletics VIP Fund, the president of the University recognized all the benefits it would provide to the University, not the Foundation.
31. At the time of the transfer of funds from the 1845 account, Peregrine was insolvent by any measure. The 1845 account held approximately $215 million less than the falsified account statements showed. As reflected in the Form 1 FR Reports that Peregrine submitted in December 2011 to the CFTC, PX 8, Peregrine had approximately $598 million in liabilities. When the total amount of assets reported in the 1 FR Report is reduced based on the actual amount in the 1845 account at that time, Peregrine's assets were approximately $152 million less than its liabilities. The University does not contest that Peregrine was insolvent at the time of the transfer (although it refused to stipulate to this obvious and uncontestable fact, along with many others).
32. Approximately $900,000 is currently credited to the Panther Athletics VIP Fund held by the Foundation.
*371 33. Peregrine was not a party to the Wasendorfs' pledge agreement and received no benefit of any sort from the payment made to the University.
34. Neither the University nor the Foundation was aware that Wasendorf was involved in any fraudulent activity or that he used segregated customer funds to satisfy his obligation to transfer $500,000 to the Foundation by December 2011.
35. Wasendorf intended to commit actual fraud on Peregrine and its customers when he caused the bank to issue the cashier's check payable to the University from Peregrine's 1845 account. Two documents admitted into evidence conclusively establish Wasendorf's actual intent to defraud: (1) Wasendorf's September 6, 2012 plea agreement in United States v. Wasendorf (PX 12), and (2) the judgment entered in United States v. Wasendorf (PX 13). In the plea agreement, Wasendorf admits that he "with intent to defraud, devised and willfully participated in a scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations and promises." PX 12, ¶ F. He also admitted that he "routinely stole PFG customer funds from a purported customer segregated account at U.S. Bank ...[and] used the stolen money to unlawfully bolster the apparent financial position of PFG, fund [his] outside business interests, and for [his] own personal use and purposes." PX 12, ¶ G. Among the crimes he committed was "embezzlement of customer funds," 7 U.S.C. § 13(a)(1). PX 13. He intentionally defrauded Peregrine and its customers by directing that the $500,000 from the 1845 account be used to pay his personal debt to the Foundation.
III. Conclusions of Law
The trustee brings two fraudulent transfer claims against the University, one based on actual fraud (Count I) and one based on constructive fraud (Count II). A plaintiff seeking to avoid a fraudulent transfer must first prove the elements of a fraudulent transfer action under either § 544(b) or § 548 of the Bankruptcy Code. He must then prove that the defendant is a party from whom the transfer can be recovered under 11 U.S.C. § 550(a). See, e.g., Grochocinski v. Reliant Interactive Media Corp. (In re General Search.com ), 322 B.R. 836, 842 (Bankr. N.D. Ill. 2005). The trustee met his burden of proving that the transfers were fraudulent based on both actual fraud and constructive fraud. He failed to prove, however, that the University was a transferee that can be held liable for the fraudulent transfer under § 550(a) of the Bankruptcy Code.
A. Actual Fraud-Count I
Count I of the complaint alleges a claim for fraudulent transfer based on actual fraud. The trustee refers in the complaint to § 548(a)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A), as well as § 544(b) of the Bankruptcy Code and various provisions of Iowa law on fraudulent transfer. At trial, however, he pursued only his claim based on § 548(a)(1)(A) so the court will address only this basis for his claim.
Under § 548(a)(1)(A), a transfer may be avoided if it was incurred "with actual intent to hinder, delay or defraud." 11 U.S.C. § 548(a)(1)(A). Direct proof of actual intent to defraud is not required. A trustee can prove actual intent by circumstantial evidence. Frierdich v. Mottaz , 294 F.3d 864, 869-70 (7th Cir. 2002) ; Grede v. UBS Securities, LLC , 303 F.Supp.3d 638, 655-56 (N.D. Ill. 2018). In a commodities context, the Seventh Circuit has held that a commodities investment manager that pledged its clients assets as collateral for its own loan acted with actual intent to hinder, delay, or defraud under *372 § 548(a)(1)(A). The court found that the manager "should have seen this as a natural consequence of its actions." In re Sentinel Management Group, Inc. , 728 F.3d 660, 666 (7th Cir. 2013). See also Federal Deposit Insurance Corporation v. FBOP Corporation , No. 14 C 4307, 2015 WL 1538802, at *7 (N.D. Ill. March 31, 2015) (following Sentinel , 728 F.3d 660 ).
Here, the University did not contest in any way the obvious: the transfer was made with actual intent to defraud. The trustee established beyond dispute that Wasendorf committed an actual fraud on Peregrine and its customers when he caused US Bank to transfer funds to the University through the cashier's check purchased with Peregrine customer funds. Wasendorf admitted in his plea agreement that he acted with intent to defraud and routinely used Peregrine customer funds for his own purposes. The trustee has proven that the transfer was actually fraudulent under § 548(a)(1)(A).
B. Constructive Fraud-Count II
Count II of the complaint alleges a claim for fraudulent transfer based on constructive fraud under § 548(a)(1)(B) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B), as well as § 544(b) and various provisions of Iowa law. At trial, however, the trustee pursued only his claim based on § 548(a)(1)(B) so the court will address only this basis for his claim.
To prevail on a claim for a fraudulent transfer under § 548(a)(1)(B), the trustee must prove: (1) a transfer of the debtor's property;[3] (2) made within one year of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) the debtor was insolvent when the transfer was made or rendered insolvent by the transfer. See Dunham v. Kisak , 192 F.3d 1104, 1109 (7th Cir.1999) ; In re First Financial Associates, Inc. , 371 B.R. 877, 896-97 (Bankr. N.D. Ind. 2007) ; Barber v. Dunbar (In re Dunbar ), 313 B.R. 430, 434 (Bankr. C.D. Ill. 2004). The trustee must prove each element by a preponderance of the evidence. See, e.g., Frierdich , 294 F.3d at 867 ; Baldi v. Lynch (In re McCook Metals, L.L.C.) , 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005).
Again, the University did not attempt to contest any of the elements of this claim at trial. The trustee proved each element of the claim: (1) the stolen funds are treated as property of the debtor under 11 U.S.C. § 764(a) ; (2) the transfer was made within one year of the petition date; (3) Peregrine received nothing in exchange for the transfer so it did not receive reasonably equivalent value; and (4) Peregrine was insolvent at the time of the transfer, owing approximately $150 million more than the value of its assets at the time. The trustee has therefore proven that the transfer through the cashier's check was constructively fraudulent under § 548(a)(1)(B).
C. "Initial Transferee" Under § 550(a)
This conclusion that the transfer was fraudulent under both § 548(a)(1)(A) and *373 § 548(a)(1)(B) does not, however, end the inquiry. Once the trustee has established that a fraudulent transfer has occurred, he must next prove that the University is a party from whom he can recover the value of the transfer. Section 550 permits the trustee to recover for the benefit of the estate the property transferred, or its value, from (1) the initial transferee of the transfer, or (2) the entity for whose benefit such transfer was made. 11 U.S.C. § 550(a)(1). Alternatively, the trustee may recover the property transferred, or its value, from a subsequent transferee unless that subsequent transferee took the property for value, in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(a)(2). As the Seventh Circuit has explained, § 550(a) essentially "divides transferees into two categories: the 'initial transferee' under § 550(a) and 'any immediate or mediate transferee' under § 550(a)(2). 11 U.S.C. § 550(a)." Smith v. SIPI, LLC (In re Smith) , 811 F.3d 228, 244 (7th Cir. 2016).
The Bankruptcy Code does not define "initial transferee." Malloy v. Citizens Benk (In re First Sec. Mort. Co. ), 33 F.3d 42 (10th Cir. 1994). It does not even define "transferee." Bonded Financial Services, Inc. v. European American Bank , 838 F.2d 890, 893 (7th Cir. 1988). As discussed more fully below, in Bonded , the Seventh Circuit defined an initial transferee as one having "dominion and control" over the asset who is free to use it any way he chooses. Many other courts have adopted this test. See, e.g., Andreini & Co. v. Pony Express Delivery Services, Inc. (In re Pony Express Delivery Services, Inc.) , 440 F.3d 1296 (11th Cir. 2006) ; Luker v. Reeves (In re Reeves) , 65 F.3d 670 (8th Cir. 1995) ; First Sec. Mortgage Co. , 33 F.3d 42 ; Security First Nat'l Bank v. Brunson (In re Coutee ), 984 F.2d 138 (5th Cir. 1993). The initial transferee "is simply the first transferee in the chain of title. And unlike an immediate or mediate transferee, the initial transferee has no defense against liability under § 550." Smith v. SIPI , 811 F.3d at 244.
The trustee seeks to recover against the University as the initial transferee. He contends that, as the sole payee on the cashier's check, the University was the only entity that could negotiate the check so it had dominion and control over the funds. He argues that the University therefore falls within the Bonded definition of an initial transferee under § 550(a)(1).
The University makes several arguments to avoid liability as an initial transferee. It first argues that it was not the initial transferee of the funds from Peregrine because Wasendorf was the initial transferee. It contends that Wasendorf obtained dominion and control over the funds when he was permitted with use a counter withdrawal slip at the US Bank branch to transfer funds out of the 1845 account. In the alternative, the University argues that even if Wasendorf was not the initial transferee of the funds, the University still was not the initial transferee because it was a mere conduit that was not entitled to use the funds. Instead, it had the legal obligation to turn the money over immediately to the Foundation.
As explained below, the first argument has no merit. Wasendorf was not the initial transferee. The second argument, however, is correct. The University was a mere conduit that cannot be held liable as an initial transferee under § 550(a)(1).
1. Wasendorf Was Not the Initial Transferee
The University first argues that Wasendorf was the initial transferee because he withdrew the funds using a counter withdrawal slip and so asserted dominion and control over the funds. The University therefore contends that it cannot *374 be the initial transferee. This argument is not persuasive.
As noted above, Seventh Circuit examined the meaning of the term "initial transferee" in Bonded Financial Services, Inc., a seminal case interpreting § 550(a). The court explained the history and purposes of fraudulent conveyance law and the limits imposed on the pursuit of fraudulent transfers. 838 F.2d at 892. In Bonded , Michael Ryan caused a corporation he controlled to issue a check made payable to a bank to which he owed money. He sent the check to the bank with instructions to deposit it into his personal account with the bank. The bank followed those instructions and credited his personal account. Ryan then instructed the bank to apply the funds to reduce the balance of his personal debt to the bank, which the bank did. The question before the court was whether the bank was an initial transferee of the fraudulent transfer under § 550(a)(1) since it was the payee on the check written on the corporation's bank account. The court's answer was no.
The court held that "the minimum requirement of status as 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." 838 F.2d at 893. It further explained: "When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." Id. The court applied these principles to conclude that the bank was acting as Ryan's agent when it received the check. It was obligated by the law of contracts and the UCC to honor Ryan's instructions, even though the check was made payable to the bank. Id. "The bank had no dominion or control over the $200,000 until January 21, when Ryan instructed the Bank to debit the account to reduce the loan; in the interim, so far as the Bank was concerned, Ryan was free to invest the whole $200,000 in lottery tickets or uranium stocks." Id. The court described this transaction as "two-step" and fundamentally different than if Ryan had sent the check payable to the bank with instructions to apply it to reduce his loan, which would be a one-step transaction. It further observed that "transferee" is "something different from 'possessor' or 'holder' or 'agent.' " It described the result of holding "anyone who touches the money" liable as an initial transferee as absurd. Id. at 894.
In this case, US Bank transferred the funds directly from Peregrine's account into its own guaranteed funds account and then immediately issued the cashier's check payable only to the University. In these circumstances, Wasendorf was not the initial transferee. Instead, as the trustee argues, a cashier's check is an order instrument that may only be negotiated only by the party to whom it is payable. I.C.A. § 554.3109. The funds used to purchase the cashier's check were transferred directly from Peregrine's account. Thus, Wasendorf never personally held any funds and he could not negotiate the check. And as Duenas credibly testified, if Wasendorf had left the branch before the check was issued or otherwise not taken the check with him, the bank would have merely reversed the transaction and transferred the funds back to Peregrine's account, not to Wasendorf personally or to any personal account of his. This was a one-step transaction purposes of the Bonded test.
Although Wasendorf presumably could have directed that the funds be transferred into one of his own accounts at the bank or that the check be made payable to him, he did not. Instead, as an officer and authorized signatory on the Peregrine account, he directed that the funds be used to purchase a cashier's check payable to the University. That is exactly what happened.
*375 Wasendorf never became the owner or initial transferee of the funds.
The Tenth Circuit applied the Bonded test to reach the same conclusion in similar circumstances. In Rupp v. Markgraf , 95 F.3d 936 (10th Cir. 1996), a principal of a corporation had a cashier's check issued from a corporate bank account to pay his personal debt. The cashier's check was made payable to his creditor. The court rejected the argument that the principal was the initial transferee. The court found that the transaction "fit into the category of one-step transactions" and determined that the creditor, not the principal, was the initial transferee. It reasoned that,
"The funds were never deposited into any personal account controlled by Davis [the principal] and Davis never had dominion or control over the funds. Because he was neither the payee nor the remitter, Davis could not personally access the funds represented by the cashier's check. He was at most a mere courier of the cashier's check from [the debtor] to [the creditor]."
Id. at 940. The court cited many cases that support this conclusion. Id. at 940-44. It noted that the extent of a principal's control over a corporation in causing it to pay funds to a personal creditor is not relevant in determining who is the initial transferee. Id at 941. The court concluded that the principal in that case was the beneficiary of the transfer under § 550(a)(1), not the initial transferee. Id. at 943.
Another case cited by the trustee, Tese-Milner v. Brune (In re Red Dot Scenic, Inc.) , 293 B.R. 116 (S.D.N.Y. 2003), reached the same result. A principal of a corporation who had checks issued from the corporation's checking account to pay his debts was not the initial transferee but was instead the transfer beneficiary. As discussed more fully below, courts treat beneficiaries of a transfer and initial transferees as separate parties; one entity cannot be both. Id. at 121.
The University cites a number of cases to support its argument that Wasendorf had sufficient dominion and control over the funds to be considered an initial transferee. None is on point or persuasive. In Ragsdale v. South Fulton Machine Works (In re Whitacre Sunbelt, Inc.) , 200 B.R. 422 (Bankr. N.D. Ga. 1996), the insider caused a check to be issued from the debtor corporation's bank account made payable to himself. He presented the check payable to himself to the bank, which then issued another check made payable to one of his creditors. He clearly had dominion and control over the money as the payee on the check issued by the debtor, and the court found him to be an initial transferee. Similarly, in Richardson v. IRS (In re Anton Noll, Inc. ), 277 B.R. 875 (1st Cir. BAP 2002), the corporate officer obtained a check from the debtor corporation's account made payable to cash. He endorsed it and used it to purchase a bank check made payable to the IRS to pay his personal taxes. The court specifically noted that "courts have uniformly rejected the notion that corporate principals should ipso facto be held to be the initial transferee when they misappropriate corporate funds. (Citations omitted.)" 277 B.R. at 879. The court explained, however, that under the Rhode Island version of the UCC, a check made payable to cash is a bearer instrument negotiable by any bearer. 277 B.R. at 880.[4] The court held that the officer had dominion and control over the funds as a holder of a bearer instrument and was therefore an initial transferee. 277 B.R. at 880. In both cases, the corporate officer held an instrument payable to him or that he could personally *376 cash. Wasendorf never held a check payable to him or that he could cash as the bearer of the check (as with a check made payable to cash).
The University next cites two criminal cases discussing counter withdrawals in the context of criminal charges. United States v. Davis , 875 F.3d 869 (8th Cir. 2017) ; Rodriguez-Quiroz v. Lynch , 835 F.3d 809 (8th Cir. 2016). Neither has any relevance to the issues in this case.
The University also relies on Kendall v. Sorani (In re Richmond Produce Co., Inc. ), 151 B.R. 1012 (Bankr. N.D. Cal. 1993). The court relied on California case law to find that the purchaser of a cashier's check has a property interest in the check before it is delivered. Obviously, California law does not apply here, the University has cited no similar Iowa law, and the facts are not analogous to this case. The complex series of financial transactions in Kendall did not involve a principal of a corporation directing that a cashier's check be issued from a corporate bank account to his personal creditor. It is not persuasive here.
Finally, the University relies on Still v. American Nat'l Bank & Trust (In re Jorges Carpet Mills, Inc. ), 50 B.R. 84 (Bankr. E.D. Tenn. 1985). Although the factual context of the case is unclear (there are no factual findings), the court stated that a corporate officer "may be an initial transferee depending on the circumstances." 50 B.R. at 85. The court then simply declared without further explanation that the corporate officer in the case was an initial transferee. Id. There was no discussion of the bank's processes or analysis of the legal issue. The opinion is unpersuasive.
The University also argues that the notation on the check stating: "Purpose/Remitter: Russell Wasendorf Sr." is somehow determinative that Wasendorf owned the funds that were used to purchase the cashier's check. In support of this argument, the University cites the Iowa version of the Uniform Commercial Code on negotiable instruments. It defines "remitter" as a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser. Iowa Code § 554.3103(k) (2013).
The University's argument fails for at least two reasons. First, the University completely ignores Duenas' credible and uncontradicted testimony that this notation on US Bank's cashier's checks has nothing to do with who was the actual purchaser of the check. Instead, the bank would write whatever the person requesting the check wanted on this line. Second, the University fails to explain why the definition of "remitter" in the Iowa version of the UCC makes any difference here. It cites no substantive provision of the UCC that uses the word so it has no bearing on the case. Even if it did, the "remitter" in this case would be Peregrine. Wasendorf appeared at the bank as an officer of Peregrine and signatory on the Peregrine account and requested that funds from the Peregrine account be used to purchase a cashier's check payable to the University. The bank granted that request. If the definition of "remitter" is relevant at all, Peregrine, not Wasendorf individually, was the remitter of the check.
2. University as Conduit for the Foundation
The University next argues that even if Wasendorf was not an initial transferee, the University was not the initial transferee because it was a mere conduit for the Foundation. It contends that a party who has no right to keep and use the transferred funds in any manner it chooses cannot be held liable as an initial transferee under § 550(a)(1). The University is correct on this point.
*377 As noted above, the Bonded "dominion and control" test for determining whether a transferee is an initial transferee or a mere conduit has been widely adopted. It is relatively simple to apply this test when the conduit is a financial institution, trustee, or escrow account. See, e.g. , Pony Express, 440 F.3d 1296 (insurance broker was a conduit for premium payments to carriers, not a creditor of the insured); First Sec. Mortgage , 33 F.3d 42 (bank was a mere financial intermediary); Coutee , 984 F.2d 138 (law firm's role as trustee for client's funds precluded it from being initial transferee of funds then paid over to real creditor). When the situation is more complex, the court must examine all the facts and circumstances to determine whether the transferee had sufficient right to use the money for its own purposes to be considered an initial transferee instead of a conduit. See, e.g., Pony Express , 440 F.3d at 1301.
Here, it is undisputed that Wasendorf made a pledge to donate to the Foundation, not to the University. It is also undisputed that the University and the Foundation agreed that all donations intended to benefit the University would be made to the Foundation, and that the Foundation would own, manage, and invest all donations. Section 3.4 of the Service Agreement between the University, the Foundation, and the Alumni Association requires that, if the University is the recipient of funds intended for the Foundation, the University must immediately transfer the funds to the Foundation.
Wasendorf clearly intended to donate to the Foundation, not directly to the University. Since Wasendorf agreed to pay the Foundation, not the University, the University was contractually required to immediately turn the funds over to the Foundation. The University did just that on the day the cashier's check was received. Shontz directed his assistant to apply a stamp endorsing the check over to the Foundation, which immediately deposited the check into its account. The University was not free to use the money for any purpose, so it could not invest it in lottery tickets, uranium stocks, or anything else.
The fact that the Foundation would later be required to use the funds to pay for goods or services requested by the head of the University's athletics department-if the expenditures fit within the Foundation's interpretation of Wasendorf's donative intent and sufficient funds were still available-does not change the result here. The Foundation was the only entity entitled to the funds paid by Wasendorf in satisfaction of his pledge. Although the Foundation exists to serve the University, so the University cannot be considered the mere agent of the Foundation, the contractual relationship between the two entities nevertheless prevented the University from keeping the funds and spending them as it chose. The University was a mere conduit for the Foundation and was obligated to transfer the funds to the Foundation to correct Wasendorf's mistake in having the check made payable to the University instead of the Foundation.
This conclusion is supported by Sarachek v. Wahls (In re Agriprocessors, Inc.) , 490 B.R. 374 (Bankr. N.D. Iowa 2013), cited by the University. The court held that a minister and the church he worked for were mere conduits for funds that were owed to workers for work they performed on property of the debtor. The minister had assisted Agriprocessors, Inc. and families in their town by recommending individuals to Agriproceesors for employment. In an informal arrangement, Agriprocessors would send checks to the minister-some payable to him and some payable to his church-with instructions on how much to pay each worker. The minister *378 cashed the checks at his personal bank and distributed the money to the workers in accordance with the instructions. When Agriprocessors filed for bankruptcy, the trustee sought to avoid the transfers to the minister and the church. Applying the Bonded test, the court found that neither the minister nor the church was liable as an initial transferee of the money; both were mere conduits. The minister had no right to put the money to his own use. The court rejected the argument that the minister or the church could have used the money for themselves merely because the checks were payable to them.
In this case, the University had a similar obligation but it was created by a written contract, not a mere informal arrangement. Under the Service Agreement, the University was required to immediately turn the funds over to the Foundation, the party for whom the funds were intended under the pledge agreement. The University was a mere conduit for the Foundation and not an initial transferee for purposes of § 550(a)(1). See A.W. Lawrence & Co., Inc. v. Burstein, et al., (In re A.W. Lawrence & Co.) , 346 B.R. 51, 57-59 (Bankr. N.D.N.Y. 2006) (debtor never held an interest in a check payable to the debtor that was endorsed over and never passed through its bank account in light of all the circumstances of the case).
(3) Trustee's Arguments
The trustee's arguments against this conclusion are not persuasive. He argued primarily that the University cannot be a conduit because it was the only party who had the initial right to negotiate the cashier's check under the UCC. He cites the Pony Express case but that decision supports the opposite conclusion in directing courts to consider all the circumstances of a transaction, not just the party to whom a check is made payable. The Pony Express court, applying the Bonded test, examined all the facts and circumstances of the transfer and concluded that an insurance agent who received funds from the debtor was not an initial transferee. 440 F.3d at 1301-04.
The trustee also argued in his trial brief that the University cannot be a conduit because it was not under "any specific instructions" from Peregrine or Wasendorf to transfer the funds to the Foundation. The University did not need to receive specific instructions from Wasendorf to have an obligation to transfer the funds. The relevant inquiry is whether the University had the right to keep the funds and use them as it chose. That question is resolved by the Service Agreement, which required the University to immediately transfer or endorse the funds over to the Foundation because the donation was intended for the Foundation.
When asked during closing argument why the University should not be considered a conduit in light of it's obligation under Section 3.4 of the Service Agreement, the trustee's counsel argued that another provision in the Service Contract applied. He contended that Paragraph 2.5.1 permitted the University to keep the money and to exercise full control over the money even if it was later transferred to the Foundation because the check was made payable to the University. This argument is not persuasive.
Paragraph 2.5.1-first pointed out by the court during the examination of a witness-is entitled "Funds Donated to University." It provides:
At its discretion, University shall designate Foundation as its agent to hold and manage funds donated to and solely in the name of the University. Foundation shall separately account for such funds, shall hold and manage such funds in accordance with the donor's intent, *379 and with the same care applicable to fiduciaries of charitable trust funds.
Paragraphs 2.5.1 (a)-(d) provide for how the Foundation must manage and account for "property" donated directly to the University but voluntarily transferred to the Foundation for management. Paragraph 2.5.1(e) then provides:
Property donated in the name of University but held by the Foundation shall be returned by the Foundation to University at University's sole discretion.
The trustee contends that, under these provisions, the cashier's check should be treated as a donation made directly to the University that the University, in its discretion, voluntarily turned over to the Foundation for management under the provisions of Paragraph 2.5.1. The trustee therefore contends that the University could require the Foundation to return the funds at any time under Paragraph 2.5.1(e) so it maintained total control over the funds even though it endorsed the cashier's check over to the Foundation.
None of the testimony or other evidence presented at trial supports this contention. Paragraph 3.4 of the Service Agreement expressly provides that, "If Foundation is the intended recipient of funds made payable to University, the funds shall first be immediately transferred to Foundation." The pledge agreement establishes that Wasendorf intended to donate to the Foundation, not directly to the University. Both Shontz and Calhoun believed the $500,000 was intended to be paid directly to the Foundation based on the pledge agreement. Both witnesses viewed the issuance of the check payable to the University instead of the Foundation as a simple mistake; the check was intended to discharge Wasendorf's obligation to pay the Foundation $500,000 by December 2011. This view is consistent with the University's policy to have all donations made to the Foundation, not directly to the University. Though none of the three checks given by the Wasendorfs was made payable to precisely the right party ("University of Northern Iowa Foundation"), each of the three payments was intended to satisfy Wasendorf's obligation to the Foundation under the pledge agreement.
There is no evidence that the University intended to invoke Paragraph 2.5.1 when it endorsed the check over to the Foundation. Instead, all the evidence demonstrates that this was yet another of hundreds of instances of donors mistakenly making checks payable to the University when the money was intended for the Foundation. Shontz testified that, as Treasurer of the University, he had the check endorsed over to the University as intended for the University. He was not asked about Paragraph 2.5.1 of the Service Agreement at trial but it is clear he transferred the endorsed the funds over to the Foundation because they were intended for the Foundation, not under Paragraph 2.5.1 of the Service Agreement. The trustee's argument that the University was not a conduit for purposes of § 550(a)(1) based on Paragraph 2.5.1 of the Service Agreement is not persuasive.
To the extent there is any tension between Paragraph 2.5.1 and Paragraph 3.4 of the Service Agreement, that tension is easily resolved by applying the appropriate section based on the donor's intent. When a donor intends to give money to the Foundation but mistakenly sends funds to the University instead, Paragraph 3.4 applies to require the University to transfer the funds immediately to the Foundation. When a donor intends to give money directly to the University and not to the Foundation (Calhoun identified one such donor), then Paragraph 2.5.1 applies and the University has the option of keeping the money itself or voluntarily transferring *380 it to the Foundation under all the terms and conditions in Paragraph 2.5.1. Here, Wasendorf intended the money for the Foundation so Paragraph 3.4 applied and the University was legally obligated to transfer the funds to the Foundation. It was therefore a mere conduit for this money for purposes of § 550(a)(1).
This case does not fit the typical situation in which the first recipient of the funds is an agent for another party, who is then deemed the initial transferee for purposes of § 550(a)(1). The University is not the agent of the Foundation and in fact, at least in some situations under the Service Agreement, the Foundation is the agent for the University. PX 6, Service Agreement, Paragraph 2.5.1. Also, as noted above, the Foundation exists to obtain donations solely for the benefit of the University and cannot use funds it receives, other than a service fee or other funds necessary to run the foundation, for any purpose other than to benefit the University consistent with the donors' intentions. These facts do not change the result here. The Foundation is an independent, private institution that owns the assets that are donated to it. Although the Foundation is obligated to pay for goods and services to benefit solely the University if funds are available and the expenditures fit within the donors' intentions, the University does not own or directly control the assets of the Foundation. The University must therefore be considered a conduit for the Foundation in all the circumstances of this case.
D. Transfer Beneficiary
Finally, the trustee argued in his trial brief and at trial that even if the University was not an initial transferee under § 550(a)(1), it should still be held liable as the entity for whose benefit the transfer was made.[5] Section 550 provides that the trustee can recover from the initial transferee "or the entity for whose benefit such transfer was made ...." 11 U.S.C. § 550(a)(1). That entity, often referred as a "transfer beneficiary," is a person who receives a benefit from the initial transfer even though it is not the actual recipient of the funds. See Bonded , 838 F.2d at 896 ; Peterson v. Hofmann (Delta Phones, Inc. ), No. 05 A 1205, 2005 WL 3542667, at *4 (Bankr. N.D. Ill. Dec. 23, 2005). The entity must benefit from the transfer directly, not indirectly, as soon as the transfer is made. See, e.g., Delta Phones , 2005 WL 3542667, at *4.
As noted above, the Seventh Circuit has held that "[a] subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." Bonded , 838 F.2d at 896 ; Delta Phones , 2005 WL 3542667, at *6 ; Laird v. Bartz (In re Newman Cos., Inc. ), 140 B.R. 495 (Bankr. E.D. Wis. 1992). "The structure of the statute separates initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]', on the other. The implication is that the 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise." Bonded , 838 F.2d at 895 ; S.I.P.C. v. Bernard L. Madoff Investment Securities LLC , 531 B.R. 439, 474 (Bankr. S.D.N.Y. 2015). Because the liability of subsequent transferees is addressed in § 550(a)(2), "the 'entity for whose benefit' phrase does not simply "reference the next pair of hands; it references entities that benefit as *381 guarantors of the debtor, or otherwise, without ever holding the funds." Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey ), 130 F.3d 52, 57 (2d Cir. 1997). "The paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor-someone who receives the benefit but not the money." Bonded , 838 F.2d at 895 ; Delta Phones , 2005 WL 3542667, at *4. See also ZVI Guttman v. Construction Program Group (In re Railworks Corp.) , 760 F.3d 398, 404 (4th Cir. 2014) (a conduit cannot be the initial transferee or an entity for whose benefit the transfer was made).
The trustee argues that the University is "the entity for whose benefit such transfer was made" because it will ultimately be able to use the funds held by the Foundation for its own benefit. This contention has no merit for at least two reasons. First, under Bonded and the other cases cited above, the University cannot be the transfer beneficiary if it will get the benefit of the funds sometime later. Under the trustee's theory, the University would apparently be a subsequent transferee under § 550(b)(2), and a subsequent transferee cannot be considered a transfer beneficiary under § 550(a)(1). Second, the University received no direct benefit at the time the transfer was made. It had only the right to benefit from the funds in the future after the Foundation deducted its fee and to the extent the Foundation's requirements for payment of the funds were met and the funds were still available. In fact, Wasendorf was the entity for whose benefit the transfer was made in this case, not the University. See Rupp, 95 F.3d at 943. His personal obligation to the Foundation under the pledge agreement was fulfilled through this payment so he immediately received a "benefit but not the money."
The trustee failed to prove that the University was an initial transferee or a transfer beneficiary under § 550(a)(1). He has not attempted to prove that the University was a subsequent transferee under § 550(a)(2). The trustee therefore failed to meet his burden of proving that he is entitled to recover the $500,000 fraudulent transfer from the University.
IV. Conclusion
For all of these reasons, the court concludes that the trustee failed to prove that the University is an entity from whom he can recover the $500,000 fraudulent transfer. Judgment will therefore be entered in favor of the University on both counts of the complaint.

In Smith v. SIPI, LLC (In re Smith), 811 F.3d 228 (7th Cir. 2016), the Seventh Circuit recently affirmed the decision of the bankruptcy court which entered a final judgment in a fraudulent transfer action when no party expressly consented to or refused to consent to the entry of final judgment by the bankruptcy court.

To the extent necessary, findings of fact should be deemed conclusions of law and conclusions of law should be deemed findings of fact.

The money transferred in this case was not Peregrine's property; it was owned by Peregrine's customers and kept in a segregated account. Subchapter IV of the Bankruptcy Code, under which commodity brokers are liquidated, permits the trustee to assert a fraudulent transfer claim as though the funds were owned by the debtor. It provides that "any transfer by the debtor of property that, but for such transfer, would have been customer property, may be avoided by the trustee, and ... [f]or the purpose of [§ 548 ], the property so transferred shall be deemed to have been property of the debtor ..." 11 U.S.C. § 764(a).

The law under the Iowa UCC is the same. Iowa Code § 554.3104 (2013).

The University objected in its trial brief to the trustee raising this grounds for recovery at trial on the basis that he did not allege in the complaint that the University could be liable as a transfer beneficiary under § 550(a)(1). The University did not raise this issue at trial, however, and instead directly addressed the merits of the transfer beneficiary issue in closing argument. Its objection on this basis was therefore waived.